## DEJARNETTE v. THE COMMONWEALTH.

1. On the examination on the *voir dire*, a juror answered that "at first he had formed a hypothetical opinion, but had afterwards heard other evidence which had tended to weaken the opinion then formed, *and that he could not say now that he had such an opinion that evidence could not remove it*, but that he preferred not to sit as a juror; and that he could give the prisoner a fair trial"—HELD: The doubt expressed by the juror, as to whether or not the opinion formed by him would yield to the testimony adduced on the trial, rendered him *incompetent*.

2. Another juror answered "that he had formed and expressed a hypothetical opinion, but that said opinion could be changed by evidence; that he had formed it from reading newspapers, and from what he had heard, but could give the prisoner a fair and impartial trial." And was then asked by the prisoner's counsel as follows: "Have you now a decided opinion on your mind as to the guilt or innocence of the prisoner, without evidence?" *Answer*—"I haven't a decided opinion, but rather a *positive* one." "Would it require evidence to remove the opinion you now have?" *Answer*—"It would." HELD: This juror was also *incompetent*.

3. Whenever the trying court has a reasonable doubt as to whether the juror can give the accused a fair and impartial trial, that doubt should be resolved in favor of the prisoner.

4. In the trial of criminal cases, especially, the court should leave to the jury, exclusively, the consideration of the facts, and no remarks which have a tendency to intimate the bias of the court on the character or weight of the testimony should be indulged in by it.

5. Whilst, in inquiries relating to insanity, every reasonable latitude should be allowed in the examination of witnesses, however false or unfounded the court may consider the defence; yet, such questions should not be allowed to be asked as would only consume the time of the court, or tend to mislead or confuse the minds of the jury. For some objectionable questions, see opinion of *Staples*, J.

6. It is always requisite, that where parties complain of the exclusion of proper testimony, the bill of exceptions must state so much of the evidence as tends to show the pertinency and relevancy of that which is excluded.

7. Where the defence, in a trial for murder, is insanity, it is competent to ask a medical expert such a question as this: " Suppose a man had inherited a predisposition to insanity, would great mental anxiety, loss of property, or the honor of one's family, and losses of other kind be likely to develop the disease ?"

8. Whilst the mere fact that the presiding judge in the trying court, on his own motion, charges the jury on the law of the case, if done correctly, is no ground for reversing the judgment; yet, such is not the practice in Virginia, and it is not desirable that it should become so.

9. Among other things, the court instructed the jury as follows: " But in every case, although the accused may be laboring under partial insanity, if he still understands the nature and character of his act, and its consequences, and has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, and possess withal a will sufficient to restrain the impulse that may arise from a diseased mind, such partial insanity is not sufficient to exempt him from responsibility to the law for his crime." HELD: This part of the instruction correctly expounded the law.

10. *Malice* being a necessary ingredient in the crime of murder, the law infers it wherever the killing is deliberate and premeditated; and it would, therefore, be error to instruct the jury that they must believe the killing was *malicious, deliberate and premeditated.* For instructions properly refused, see opinion of *Staples*, J.

11. Where insanity is relied on as a defence, it must be proved to *the satisfaction of the jury*, and it is not necessary that the jury shall be satisfied of the sanity of the prisoner, *beyond all reasonable doubt.* See *Boswell's case*, 20 Gratt. 860; *Baccigalupo's case*, 33 Id. 807.

12. Whatever may be the right of counsel, in criminal cases, to maintain by argument to the jury propositions of law untrammeled by the court, where no instructions have been given by it, as to which no opinion is expressed; yet, where the court has instructed the jury, in accordance with principles established by this court, counsel have no right to argue against such instructions.

At the August term, 1880, of the Hustings court of the town of Danville, James Thomas Dejarnette was indicted for the murder of his sister, Mollie Dejarnette. He was tried at the October term of the court and found guilty of murder in the first degree.

In the progress of the case the prisoner took twenty bills of exception to rulings of the court. The last was to the refusal of the court to grant a new trial, in which all the evidence is set out.

There was no question that the prisoner had killed his sister in a house of ill-fame in the town of Danville; and the only ground of defence as indicated by the evidence, was insanity. The several exceptions are stated by Judge *Staples* in his opinion. The court having sentenced the prisoner in accordance with the verdict, he applied to a judge of this court for a writ of error and *supersedeas*, which was accorded.

*Cabell & Peatross* and *Withers & Barksdale*, for the prisoner.

*The Attorney-General*, for the Commonwealth.

STAPLES, J., delivered the opinion of the court.

This case comes before us upon a writ of error to a judgment of the corporation court of Danville, sentencing the accused to be hanged. Numerous errors are assigned in the petition for an appeal, which will be considered in the order in which they are presented.

The first bill of exceptions states that upon the calling of the venire, C. H. Barksdale, one of the veniremen, being asked by the court whether or not he had formed or expressed an opinion as to the guilt or innocence of the prisoner, said that at first he had formed a hypothetical opinion, but had afterwards heard other evidence which tended

to weaken the opinion then formed, *and that he could not say now that he had such an opinion that evidence could not remove it,* but that he preferred not to sit as a juror, and that he could give the prisoner a fair trial. And thereupon the court decided him to be a competent juror.

The material point for our consideration in the answer of the juror, is his inability or unwillingness to state how far his judgment would be affected by his preconceived opinions.

His response to the inquiry of the court was that he could " not now say that he had such opinion that evidence would not remove it." Nor did he say that the opinion was of such a character that evidence would remove it. In other words, he was in doubt whether the opinion he had formed would yield to the testimony to be adduced on the trial. If the juror was in a frame of mind which would enable him to render an impartial verdict, uninfluenced by his previous impressions, it is but fair to presume that he would have so declared. The fact that he did not, or was unable to do so, and thus solve the doubt, was sufficient to disqualify him.

It has been held in other States, by courts of most respectable authority, that when the opinion of the juror is so fixed that it would require evidence to remove it, he is incompetent, and this upon the ground that when he enters the jury-box he is not indifferent, and the burden is cast upon the accused of combatting a preconceived judgment of his case; a burden from which the Commonwealth is exempt, and which is inconsistent with the humane spirit of the law. Proffatt on Jury Trials, §§ 183, 186, 193, and cases there cited. In this State, however, a contrary rule has been adopted. With us it is uniformly held that the formation of a previous opinion does not, of itself, render the juror disqualified, if it be of such a character that it will yield to testimony, and the juror can give a fair and

impartial trial. But these are indispensable prerequisites. In no case has it ever been held by this court, or the general court, that the juror is competent when, upon his own showing, it was left in doubt whether his opinion would be removed by the testimony adduced on the trial. On the contrary, it is believed in every instance it was deemed essential it should be made to appear, beyond a reasonable doubt, that the previously formed opinions of the juror would yield to the evidence. Upon this subject, I refer to Matthews' Criminal Digest, 282, which contains numerous citations from the Virginia cases. In other States, the utterances of the courts are still more emphatic and distinct. In *Holt* v. *The People*, 13 Mich. R. 224, Judge Cooley said that in criminal cases, wherein, after a full examination, the testimony given upon a challenge leaves a reasonable doubt of the impartiality of the juror, the defendant shall be given the benefit of the doubt.

In *Cancemi* v. *The People*, 16 New York R. 501, the juror was held disqualified because his own testimony did not clearly disclose the precise state of his mind in relation to the case.

In *Staup* v. *Commonwealth*, 74 Penn. St. R. 458, Agnew, J., said that the opinion of the juror, even when founded on rumor or newspaper statements, must be such as he feels *conscious he can dismiss* upon the trial.

As was said by this court in *Wright's case*, 32 Gratt. 941, the juror must be able to give the accused a fair and impartial trial. Upon this point nothing should be left to influence or doubt. All the tests applied by the courts, all the inquiries made into the state of the juror's feelings, are simply with a view of securing a tribunal competent to receive and weigh the evidence, and render a verdict accordingly, unimpaired by prejudice or preconceived opinions.

If there is a reasonable doubt of whether the juror comes

up to this standard, that doubt should be resolved in favor of the accused.

It is very true that in the present case the juror stated that he could give the prisoner a fair trial. Few men would be willing to acknowledge they could not do the same thing. As was said by Judge Scott in *Armstead's case,* 11 Leigh, 663, "however willing the juror might be to trust himself, the law will not trust him."

We think, therefore, the corporation court erred in over-ruling the objection of the accused to the venireman mentioned in the first bill of exceptions.

The second bill of exceptions states that James P. Hawkins, a venireman, being asked by the court whether he had formed and expressed any opinion as to the guilt or innocence of the prisoner, answered, "that he had formed and expressed a hypothetical opinion, but that said opinion could be changed by evidence; that he had formed it from reading newspapers, and from what he had heard, but could give the prisoner a fair and impartial trial." And, there-upon, the prisoner propounded to him the following questions: "Have you now a decided opinion in your mind as to the guilt or innocence of the prisoner, without evidence?" To which the juror answered: "I haven't a decided opinion, but rather a positive one." "Would it require evidence to remove the opinion you now have?" To which the juror answered: "It would." Whereupon the court held the juror to be competent, and accepted him as such.

It will be observed that the juror draws a distinction between a decided and a positive opinion. What his precise meaning was, it is difficult to say. For the word positive, as defined by lexicographers, signifies that which is clearly expressed, not admitting of doubt, condition, or qualification, indisputable, decisive, confident. If, therefore, this were a case of first impression in Virginia, speaking for myself alone, I should not hesitate to say that this

man was not a competent juror. But it cannot be denied that the latter decisions of the general court, and of this court, have gone very far the other way, particularly in the cases of *McCune et als.* v. *Commonwealth,* 2 Rob. R. 771, and *Epes' case,* 5 Gratt. 676. According to these decisions, there would be great difficulty in sustaining the objections to the competency of this juror. The other judges are, however, of opinion that he is disqualified and ought to have been rejected, and without intending to depart from the rules laid down in previous cases, they are of opinion that these cases have gone quite far enough; that whilst they may be looked to for the purpose of ascertaining general principles and rules of decision, they cannot be relied upon as infallible guides in other cases, where so much depends upon the peculiar circumstances affecting the opinion of the particular juror. And with respect to the venireman here, whatever confidence he may have in his ability to give the accused a fair trial, however willing he may be to trust himself, it is plain, from his own showing, he had prejudged the case, and was, therefore, unfit to be trusted with the important duty of passing upon the question of the prisoner's guilt or innocence. A majority of the court are therefore of opinion that the corporation court erred in overruling the objections to the veniremen.

The third and fourth bills of exceptions set forth the objections of the accused to two other veniremen accepted by the corporation court, but these objections are not well taken, according to the decisions of this court in numerous cases which have already been referred to, and need not be again cited.

The fifth bill of exceptions states that whilst Dr. T. W. Keene, a medical witness for the accused, was explaining to the jury the difference between moral and intellectual insanity, and giving the opinions of writers thereon, the presiding judge stopped the witness, and in the presence of

the jury, said to the Commonwealth's attorney: "Is it possible, sir, that you sit there and permit such testimony as that without objection?" To which the Commonwealth's attorney replied: "Yes, sir; I am willing to hear it all." When the court replied: "I will not stop it unless *you* object." To which question and interference of the court, and the manner in which it was done, the accused excepted.

In view of the fact that a new trial is to be had on other grounds, and inasmuch as the same matter is not at all likely to arise again, it is not deemed necessary now to decide whether or not the interference and remark of the presiding judge constitutes error sufficient for the reversal of the judgment, more especially as a decision of that point involves the necessity of passing upon the relevancy of the testimony of the witness. But to prevent any possible misapprehension in the future, it is proper to say that in the administration of justice, it is of great importance that the court should leave to the jury exclusively the consideration of the facts.

In this State, all expression of opinion, or comments, or remarks upon the evidence, which have a tendency to intimate the bias of the court with respect to the character or weight of the testimony, particularly in criminal cases, are watched with extreme jealousy, and generally considered as invasions of the province of the jury. Nothing of the kind was, of course, intended by the learned judge of the court below. His remark was no doubt prompted by a feeling of some warmth at what he considered improper testimony given to the jury without objection from the prosecuting attorney.

The 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th bills of exception may be considered together. In one of them, Dr. Thomas W. Keene, a witness for the accused, is asked the following question: "Is it not recognized by the highest authority in the medical profession

that a person may commit an act under the influence of a delusion, because he believes it to be right and his duty?"

In another the witness is asked, "How intellectual insanity affects a man?" "and how moral insanity affects him?" In another, "What is the difference between intellectual and moral insanity?" In another, "What is latent or concealed insanity, and how does it affect a man?" In another, "What is transitory insanity?" In another, "What is insane impulse?" In another, "What do medical men mean by insane temperament?" In another, "What circumstances would be likely to develop latent inherent insanity?" In another the witness is asked to give the symptoms of moral insanity." In another he is asked, "What is insanity?" All of these questions were excluded by the court.

Neither of these bills of exceptions set forth any of the testimony adduced on the trial to show the relevancy of these questions to the matters in issue. They extend over an almost unlimited field of inquiry, involving a discussion of the laws of insanity in all its complicated and mysterious phases. Their only effect was to consume the time and attention of the court, and to mislead and confuse the mind of the jury with perplexing discussions upon the symptoms of the various forms of derangement as developed in the human mind. We are, therefore, of opinion that the corporation court did not commit any error in excluding the questions and answers thereto from the jury.

At the same time, we are not to be understood as saying that neither of the questions set forth in these bills of exception would be proper under any state of circumstances. In the progress of a trial facts may be, and often are, developed, which render it proper for the medical witness to describe the symptoms of a particular disease, mental or physical, which may be the subject of investigation.

It is utterly impossible for an appellate court to lay

down any rule on this subject, or to say as an abstract proposition, what questions may or may not be propounded to the medical witness. In all inquiries relating to insanity, every reasonable latitude should be allowed in the examination of witnesses, however false or unfounded the court may consider the defence. It is always required, however, that parties complaining of the exclusion of proper testimony, shall state in the bill of exceptions so much of the evidence as tends to show the pertinency and relevancy of that which is excluded. Without this, as a general rule, it is impossible for the appellate court to say that any error has been committed to the prejudice of the party complaining. But to prevent any misapprehension upon a future trial, it is proper to state that the question set out in the 13th bill of exceptions may be properly asked a medical witness qualified to testify on such a subject.

That question is as follows: "Suppose a man had inherited a predisposition to insanity, would great mental anxiety, loss of property, or the honor of one's family, and losses of other kind be likely to develop the disease?" It has often been held that a medical witness, although he has never seen the patient, after hearing the evidence of others, may be called to prove the general effect of the disease described by them, and its probable consequences in the particular instance.

In *Wright's case*, reported in vol. 1, page 457, British C. Cases, it was held by all the judges, that a witness of medical skill might be asked whether, in his judgment, such and such appearances were symptoms of insanity, and whether a long fast, followed by a draught of strong liquor, was likely to produce a paroxysm of that description. See. also 1 Philips on Evidence, 654; *Rex* v. *Searle*, 1 Mood. & Ro. 75; *United States* v. *McGlue*, 1 Curtis, p. 1.

We are thus more particular in considering the question set out in the 13th bill of exceptions, because by reference

to another bill of exceptions it appears that evidence was adduced on the trial tending to show the existence of insanity in the ancestors of the accused, and it is almost certain that the same question will be propounded on a future trial.

We come now to the 17th bill of exceptions, from which it appears that after the conclusion of the argument, the court, of its own motion, proceeded to instruct the jury upon the principles of law by which insanity is to be tested.

To this action of the court, in so instructing the jury of its own motion, as well as to the doctrines therein laid down, the accused excepted.

In the first place, although it is not the practice in Virginia for the court unasked to charge the jury upon the law of the case, yet the mere fact that it does so cannot of itself be assigned as error. *Womack* v. *Circle*, 29 Gratt. 192. The accused has certainly no just cause of complaint if the law is properly expounded.

There are cases, indeed, in which it would be not only proper, but the duty of the court, even though unasked, to instruct the jury upon the principles of law by which they should be governed in rendering their verdict.

We think, however, that the practice in Virginia is a wise one in general, for it is extremely difficult to deliver charges to the jury without conveying to them some intimation of the opinion of the judges upon the evidence, or using some phrase or expression which may constitute a ground of just exception.

In the case before us, the charge of the learned judge sets forth at great length, and with much minuteness of detail, the principles of law by which the jury were to be guided and the tests to be applied in cases of insanity. It is but just to say that the charge evinces much elaboration and research, creditable alike to the industry and the learning of the learned judge. No just exception can be taken certainly to the following exposition of the law :

"But in every case, although the accused may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences, and has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, and possesses withal a will sufficient to restrain the impulse that may arise from a diseased mind, such partial insanity is not sufficient to exempt him from responsibility to the law for his crimes."

We think the rule here laid down is in accordance with the best authorities, as well as the dictates of reason and justice. The learned judge also tells the jury "the character of the mental disease principally relied upon to excuse the prisoner is, that he did the killing under an irresistible impulse, which was the result of a diseased mind." He then proceeds to define "an irresistible impulse" as a moral or homicidal insanity, consisting of an irresistible inclination to kill or commit some other offence—some unseen pressure on the mind, drawing it to consequences which it sees, but cannot avoid, and placing it under a coercion which, while its results are clearly perceived, it is incapable of resisting. The learned judge then declares it was for the jury to say whether the prisoner was *forced* to do the killing by such a controling disease against his will, or whether he did it voluntarily, with intention to destroy the life of the deceased. Certainly no sound exception can be taken to this definition of homicidal mania or irresistible impulse, as it is sometimes termed; a diseased state of the mind, the tendency of which is to break out in a sudden paroxysm of violence, venting itself in homicide or other dangerous and violent acts upon friend and foe indiscriminately.

The real objections to the instructions is, that the jury are told that this species of insanity is the *principal defence*

of the prisoner. Indeed, this idea of homicidal mania pervades the entire charge, and the jury might justly have inferred the only question they need to consider was, whether or not the accused was laboring under this species of insanity at the time of the commission of the offence. We must, of course, accept it as true that the defence of homicidal mania was relied upon in the court below. The record does not, however, show the fact. Neither in the testimony of the witness, nor in the instructions asked for by prisoner's counsel, is there any special reference to this species of partial derangement.

The effort of the defence seems to have been rather to establish the existence of latent hereditary insanity in the accused, developed into active exertion by the shock he had received; but what form of mental aberration, whether homicidal mania merely, or temporary derangement, or general hallucination or delusion, were relied upon, this record does not inform us.

The court might very properly have said to the jury, if such was the fact, that irresistible impulse was relied upon as a defence, and stated the principles of law applicable to the case. In so doing, however, the instruction should have been so framed as not to create the impression upon the mind of the jury that this form of insanity was the sole object of their inquiry.

With respect to the three instructions given by the court as a substitute for those asked for by the prisoner's counsel, we think they correctly state the law. The third instruction especially is as favorable to the accused as is consistent with the established rules of criminal law.

The instructions asked for on the part of the defence were properly refused.

The first of the series affirms that in order to convict the prisoner of murder in the first degree, the jury must believe the killing was willful, *malicious, deliberate* and premeditated.

Malice is, of course, a necessary ingredient in the crime of murder, and the law infers it where the killing is deliberate and premeditated. The statute, however, in defining the offence of murder in the first degree, does not use the word *malicious*, for the simple reason that malice aforethought is in such case a conclusion of law. To have instructed the jury, therefore, they must be satisfied the killing was malicious, was to add to the statutory definition of the offence, and to beget the confusion in their minds of supposing they must find the existence of malice as a fact, where it was necessarily implied by law.

The second and third instructions are as follows:

2d. The court further instructs the jury that in weighing the evidence as to the malice, deliberation and premeditation of the prisoner, they should take into consideration the condition of the prisoner's mind at the time of the receipt of the intelligence which led to the homicide and the effect which the sudden intelligence of great calamity or overwhelming shame would have upon his mind.

3d. If the jury believe from the evidence that, at the time of the killing, the prisoner, by reason of a predisposition to insanity, inherited from his ancestors, developed by the information of his sister's living in a house of ill-fame, was not in a frame of mind to deliberate and premeditate, then the killing would not be murder.

Both these instructions are of so vague and ambiguous a character, it is very difficult to determine what precise proposition they were designed to assert, or what tests they were intended to prescribe as a measure of criminal responsibility. They were calculated to mislead the jury, and were properly refused. At the same time, there are, doubtless, cases in which, whilst the prisoner may not be insane, in the sense which exempts from punishment, yet he may be in that condition from partial aberration or enfeeblement of intellect which renders him incapable of the

sedate, deliberate and specific intent necessary to consti-
tute murder in the first degree. These are questions for
the jury, and not for the court.

As has been already stated, it is not possible, in the na-
ture of things, that the court can lay down any abstract
rules with which to measure the minds of men, or to deter-
mine the extent of their criminal responsibility, in cases
of alleged insanity. See Wharton on Homicide, § 584 and
notes; Stephen's Crim. Law, 92; 1 Whar. and Stille's Med.
Jour. § 770.

The fourth instruction declares that the prisoner is to be
acquitted on the ground of insanity, unless the jury are
satisfied beyond a reasonable doubt that the killing was
not produced by mental disease.

The proposition asserted in this instruction is manifestly
based on the idea that the jury must be satisfied beyond all
reasonable doubt of the sanity of the accused, precisely as
the prosecution is required to prove the guilt of the de-
fendant to warrant a conviction. It is in direct conflict
with the decisions of this court in *Boswell's case*, 20 Gratt.
860, 876, and *Baccigalupo* v. *The Commonwealth*, 33 Gratt. 807.

In these cases it was unanimously held that the Com-
monwealth, having established the *corpus delicti*, and that
the act was done by the accused, has made out her case.
If he relies on the defence of insanity, he must prove it to
the satisfaction of the jury. If, upon the whole evidence,
they believe he was insane when he committed the act,
they will acquit him on that ground; but not upon any
fanciful idea that they believe he was then sane, yet, as
there may be a rational doubt of such sanity, he is there-
fore entitled to an acquittal. Insanity is easily feigned
and hard to be disproved, and public safety requires that
it should not be established by less than satisfactory evi-
dence.

These rules were laid down by this court after a careful examination of all the authorities, and we are not disposed to depart from them, or even to qualify them in the minutest particular.

We come, then, to the 18th bill of exceptions, which states, after the conclusion of the opening speech of the Commonwealth's attorney, one of the counsel for the prisoner announced to the court, before beginning his argument, that in the course of his argument, if not stopped by the court, he would argue to the jury, that if upon the whole testimony the jury had a reasonable doubt of the prisoner's sanity at the time of the killing, the prisoner was entitled to an acquittal; and the court stated to the counsel that he could proceed until he came to that point in his argument, and then the court would say whether it was proper or not.

And when the counsel came to that point he attempted to argue to the jury the above proposition of law, and the court interrupted him and stated that such was not a correct conclusion of law, and could not be argued to the jury as the law.

It will be perceived that the counsel proposed to argue before the jury a proposition of law the very reverse of that laid down by this court in the cases already adverted to. His attempt was, however, accompanied with the declaration that he would maintain the proposition unless stopped by the court. This could only be construed as an invitation to the judge to express his approval or disapproval of the line of argument to be pursued. Had the latter, under such circumstances, remained silent, the counsel might justly have inferred, and the jury would have been warranted in supposing that the argument was made under the sanction of the court. Counsel having thus appealed directly to the court, could not be permitted to argue before the jury in opposition to an opinion which he himself had

called for. Whatever may be the right of counsel in criminal cases to maintain, by argument, any proposition of law, untrammeled by the court, where no instructions have been already given, as to which we express no opinion in this case, there is less ground for complaint, because, as already intimated, the law had been finally settled by two solemn decisions of this court, and was no longer open for discussion. Wharton on Criminal Laws, § 327; *Garth's case*, 3 Leigh, 761. If decisions so made may be reviewed and reversed at the mere caprice and pleasure of juries, it is vain to say that we have any established rules and principles of criminal law.

This disposes of all the questions arising upon the record, except the motion to set aside the verdict, because it was not sustained by the evidence. In view of the fact, however, that a new trial is to be had on the grounds already mentioned, it is unnecessary, and, indeed, would be improper for this court, to pass upon that question.

In considering the various errors assigned in the petition for an appeal, we have carefully refrained from any expression, or even intimation, of opinion with respect to the character and nature of the defence made for the accused. This is a matter for the jury exclusively. Our duty is performed in seeing to it, as far as within us lies, that the prisoner obtains a fair trial by an impartial jury, according to the established principles and rules of criminal law, recognized by the courts, and enforced by the constitution and laws of the country.

The judgment of this court is, that the verdict of the jury be set aside, and a new trial awarded the accused, in conformity with the views herein expressed.

The judgment was as follows :

The court is of opinion, for reasons stated in writing and filed with the record, that the judgment of the hustings court is erroneous.

It is, therefore, considered that said judgment be reversed and annulled, the verdict of the jury set aside, and a new trial awarded the plaintiff in error; upon which said new trial the said hustings court will conform its action to the opinion of this court, a copy of which is ordered to be certified along with this judgment to the said hustings court.

JUDGMENT REVERSED.