**Luther DURHAM, Jr., Petitioner,**

**v.**

**J. D. COX, Superintendent, Virginia State Penitentiary, Respondent.**

**Civ. A. No. 69–C–25–H.**

United States District Court,
W. D. Virginia,
Harrisonburg Division.

July 16, 1971.

J. Sloan Kuykendall, E. William Chapman, Winchester, Va., for petitioner.

C. Tabor Cronk, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION

WIDENER, District Judge.

On an afternoon late in February, 1963, Mrs. Waltine Hoover and her mother, Mrs. E. M. Snow, were stabbed to death in their home near Double Toll Gate in Frederick County, Virginia. Seven months later, Luther Durham, Jr., petitioner, was arrested in King George County, Virginia on a charge of breaking and entering. In the weeks following his arrest, Durham implicated himself and others in numerous housebreakings throughout Virginia. Between October, 1963 and May, 1964, he was convicted in five Virginia counties upon his pleas of guilty to charges of breaking and entering, statutory burglary and grand larceny.

The record discloses that Durham is a confirmed criminal of amoral character.

In late February, 1964, Durham gave the State Police a statement implicating himself and others in the murder of a Stafford County, Virginia service station attendant. He was indicted for that murder on March 2, 1964.[1] At the request of an attorney appointed to represent him in the Stafford County case, Durham was taken to the State Penitentiary on June 11, 1964 to undergo a mental examination. The examination was completed on June 17. On June 23, while awaiting return to Stafford County, Durham confessed his involvement in the Double Toll Gate slayings to State Police Investigators E. M. Lloyd and L. F. Craft. In his statement, which was transcribed by Craft, Durham related that he and his employer, Otha Howard, had broken into the Double Toll Gate home and that Howard had murdered the two women.

On July 14, 1964, Durham, accompanied by Lloyd and Craft, returned to the scene of the Double Toll Gate murders and reenacted the events surrounding the crimes, again naming Howard as the actual slayer. He was then brought to the office of the Frederick County Commonwealth's Attorney, where, on the same day, he signed another written statement which was generally in the same terms as his earlier confession of June 23rd.

Durham and Howard[2] were indicted by a grand jury in Frederick County for the murders of Mrs. Snow and Mrs. Hoover on July 20, 1964. Two attorneys were appointed to represent Durham. At their request, he was committed to Southwestern State Hospital for a mental examination on August 15, 1964. He was found mentally competent to stand trial and, on November 16, 1964, was arraigned and pleaded not guilty to both indictments. Durham's trial for the murder of Mrs. Snow was set for February 9, 1965, but was later continued.

On March 15, 1965, while at the Winchester City Jail awaiting trial, Durham signed a third written statement of his involvement in the Double Toll Gate murders. His account of the slayings was again substantially similar to those in his earlier statements, except that, instead of Howard, one George Easter was named as Durham's accomplice and the actual slayer of the two women. Durham made this statement pursuant to a written agreement with the Commonwealth's Attorney under which the latter agreed to make certain recommendations regarding sentencing in exchange for Durham's guilty plea and his cooperation in bringing to justice any others involved in the Double Toll Gate murders.

On March 18, 1965, the Circuit Court of Frederick County permitted Durham to withdraw his earlier pleas of not

---

1. The Stafford County indictment was *nolle prossed* on May 10, 1965.

2. The indictment against Howard was *nolle prossed* on November 16, 1964.

guilty and to enter pleas of guilty to the two murder indictments. On June 1, 1965, prior to his presentence hearing, Durham escaped from the Frederick County jail and was recaptured the same day. At his presentence hearing held on June 28, 1965, Durham moved to withdraw his guilty pleas. His motion was granted and he was rearraigned on July 2, 1965, pleading not guilty to both indictments. On July 26, 1965, Durham again attempted to change his pleas to guilty but his motion was this time denied and the case against him for the murder of Mrs. Snow was again set for trial.

In August of 1965, Durham's two court-appointed attorneys were, with his consent, permitted to withdraw from the case and new counsel was appointed. On November 18, 1965, following a three-day trial in the Circuit Court of Frederick County, a jury found Durham guilty of murdering Mrs. Snow and sentenced him to life imprisonment, which sentence he is now serving. Durham was denied a writ of error by the Supreme Court of Appeals of Virginia. Durham v. Virginia, 207 Va. lxxxiii (1966). The United States Supreme Court denied his petition for a writ of certiorari. 387 U.S. 910, 87 S.Ct. 1694, 18 L.Ed.2d 629 (1967).

By his petition filed here, Durham now seeks relief from his conviction by way of federal habeas corpus, as provided under 28 U.S.C. § 2254. This court appointed two attorneys to represent petitioner and, at Durham's request, held a hearing *ore tenus* on his claims on February 26, 1971. Petitioner appeared with his attorneys at the hearing and chose not to testify.

▆ The grounds asserted by Durham as entitling him to relief are as follows:

1. The admission at trial of evidence regarding Durham's escape from jail pending his trial;

2. The systematic exclusion from the jury of veniremen who expressed conscientious scruples against capital punishment;

3. Denial of the right to trial by an impartial jury;

4. Prejudicial pretrial publicity;

5. Denial of the right to counsel at interrogations;

6. The admission into evidence of involuntary confessions.

Of the above allegations, the second and fourth have not yet been presented to a Virginia court. Petitioner has not exhausted his state remedies as to them, as required by 28 U.S.C. § 2254(b), and they will not be considered here. The remaining allegations were the subject of Durham's application to the Virginia Supreme Court of Appeals for a writ of error. Consideration of these follows.

It is contended first that the admission at petitioner's trial of testimony describing his escape from jail while awaiting trial deprived him of due process of law. The court is aware of no constitutional precept which renders such evidence inadmissible *per se*. Petitioner cites no case in support of his proposition, claiming only that evidence of an accused's flight tends to prejudice the jury and is of slight probative value with respect to the crime charged. Therefore, he urges such evidence should be held inadmissible under the same rationale which prohibits a prosecutor from commenting upon a defendant's failure to testify. See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), reh. den. 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965). Although in *Griffin* the Supreme Court questioned the probative value of an accused's failure to testify, the explicit basis of its ruling was that comment upon such failure violates the self-incrimination clause of the Fifth Amendment, as made applicable to the states by the Fourteenth Amendment in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Citing Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), Mr. Justice Stewart pointed out in *Griffin* that the Supreme Court " * * * long ago decided that the Due Process Clause

of the Fourteenth Amendment does not *of its own force* forbid this kind of comment * * *." [Emphasis supplied]. 380 U.S. at 619, 85 S.Ct. at 1235 (dissenting opinion). The analogy of the present claim with that resolved in *Griffin,* therefore, is of little help to petitioner.

■ Evidence of the flight of an accused, moreover, has long been held in both federal and Virginia courts a circumstance which may be considered by the jury as having a tendency to establish his guilt. See, e. g., Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); Anderson v. Commonwealth, 100 Va. 860, 42 S.E. 865 (1902). It was submitted to the jury in the present case as a fact to be considered,[3] not as determinative of guilt. Cf. Bird v. United States, 187 U.S. 118, 23 S.Ct. 42, 47 L.Ed. 100 (1902); Starr v. United States, 164 U.S. 627, 17 S.Ct. 223, 41 L.Ed. 577 (1897). This court finds no indication in that context of fundamental unfairness in permitting the facts surrounding Durham's escape to be considered by the jury. Their admissibility is thus solely a matter of state law and procedure and does not warrant intervention by federal habeas corpus. See Grundler v. State of North Carolina, 283 F.2d 798, 802 (4th Cir. 1960).

By the fifth and sixth allegations of his petition, Durham complains that certain of his incriminating statements should not have been admitted into evidence at his trial. For purposes of reference, the statements complained of are listed by the court as follows:

1. A signed confession taken at the Virginia State Penitentiary by State Police Investigators Lloyd and Craft on June 23, 1964;

2. Petitioner's oral statements made en route to and at the scene of the murders on July 14, 1964;

3. A signed confession taken at the office of the Frederick County Commonwealth's Attorney on July 14, 1964;

4. A signed confession taken at the Winchester City Jail on March 15, 1965.

Of these, the first, second and third statements are claimed to have been elicited while Durham was being denied the right of assistance of counsel. Additionally, all four statements are attacked as being involuntary. For reasons which follow, the court finds that neither of these claims entitle Durham to relief. His claims will be discussed initially as they apply to his first and second statements referred to above.

■ The court finds no substance to Durham's claim that he was denied the right to counsel. He necessarily[4] rests this assertion on the authority of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In *Escobedo,* police had elicited an incriminating statement from a suspect who had not been advised of his right to remain silent, whose requests to see his attorney were repeatedly denied, and whose attorney was denied access to his client. The Supreme Court held that:

" * * * where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his

---

3. The trial judge instructed the jury that " * * * the flight of the accused is evidence to be considered by (the jury) and given such weight as they deem proper in connection with other pertinent material facts and circumstances of the case. All facts and circumstances of the flight are pertinent evidence for or against the accused."

4. The standards announced in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) are not here available to petitioner, his trial having taken place prior to that decision. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment * * *." 378 U.S. 490–491, 84 S.Ct. 1765.

The circumstances surrounding Durham's statement of June 23, 1964 bear no resemblance to the interrogation procedures proscribed in *Escobedo*. Officers Craft and Lloyd testified at Durham's trial that, prior to questioning Durham, Lloyd advised him of his right to counsel and that he did not have to make any statement. The statement itself, which was read to and signed by Durham, states that he knew that he was entitled to counsel and that anything he said could be used against him in a court of law. Durham admitted at trial that he was so advised.

Petitioner points to the fact that, prior to June 23, 1964, an attorney, Russell Roberts, had been appointed to represent him on the unrelated murder charge in Stafford County. He contends that the questioning of June 23rd, in Roberts' absence, was improper under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Massiah*, however, is inapposite. The Supreme Court there condemned the use at trial of statements surreptitiously elicited from an accused after he has been *indicted* and in the absence of his retained counsel. Unlike Massiah, who was unaware that police were overhearing his statements, Durham knowingly chose to make his statement in the absence of counsel after being advised of his right to have counsel present. That such a choice may properly be made was specifically recognized in *Escobedo, supra*, 378 U.S. at 490, n. 14, 84 S.Ct. 1758.

Durham's claimed denial of assistance of counsel is equally ill-founded as applied to his oral statements of July 14, 1964, made en route to and at the scene of the Double Toll Gate murders. Investigators Lloyd and Craft, who accompanied Durham for the reenactment, testified that Lloyd had again advised Durham of his rights, including the right to counsel, prior to leaving the penitentiary. The court notes, moreover, that it was conceded in Durham's petition for a writ of error filed in the Virginia Supreme Court of Appeals that " * * * Durham was consistently advised of his right to counsel." [5] In short, the record overwhelmingly refutes petitioner's claim that he was denied his right to assistance of counsel, and he is entitled to no relief on that count.

We turn next to consideration of Durham's claim that the statements referred to above were made involuntarily. Again, that claim is discussed at this point only insofar as it applies to his written statement of June 23, 1964 and his oral statements of July 14, 1964.

The issue of whether an incriminating statement was voluntarily made necessarily turns on the "totality of the circumstances" surrounding its elicitation. *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Clewis v. State of Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). The circumstances alleged to have rendered petitioner's confessions involuntary are that his statements were the product of prolonged interrogation, that petitioner "was never advised of his absolute constitutional right to remain silent," and that, at the time the statements were given, petitioner was a young man with very little formal education. It is also claimed that Durham's confessions were induced by promises of leniency.

5. The petition was prepared by Durham's trial counsel. It was filed just prior to the decision in *Miranda, supra,* and questioned the admissibility of Durham's confessions on the theory that the Commonwealth was required to appoint an at-torney to represent Durham prior to questioning him, regardless of whether he requested counsel. While the statement of counsel in the petition may not bind Durham, it is nevertheless noteworthy.

Durham has a sixth grade education and was twenty-one years old at the time he first confessed his involvement in the Double Toll Gate slayings. At that time, as noted, he was under indictment for murder in Stafford County. Prior to the appointment of Roberts as his attorney, approximately six attorneys had been appointed to represent Durham in connection with the various charges against him in other counties. Durham claimed at trial that he and State Police Investigator J. E. Hall, who was investigating the Stafford County murder, had discussed a pardon " * * * if I would testify and if I would name certain people and implicate certain people." He claimed that he would not have made the statement of June 23rd if such promises had not been made. Roberts first visited Durham at the Fredericksburg Police Station on May 20, 1964. According to Roberts' testimony at an exclusionary hearing held during petitioner's trial, either Hall or Durham raised the question of " * * * what can be done to help Mr. Durham, should he testify in Stafford County against the others." Roberts further stated that:

" * * * Mr. Hall and I agreed that if he did testify in Stafford County and if what I was told * * * was the truth, that certainly efforts in Mr. Durham's behalf with the Governor for a pardon would be in order, and I said that I would do everything I could to help, and Mr. Hall agreed to help as well."

Upon hearing from Hall that Durham had been "quite helpful to the State Police in solving other crimes," [6] Roberts advised Durham that "if he did know something about these crimes, he would have to testify in order to get a pardon * * *." Roberts emphasized to Durham that he would have to be telling the truth and not himself be implicated in the crimes.

Petitioner claimed also at trial that, prior to giving his statement of June 23rd to Lloyd and Craft, he and Lloyd had been talking about various "deals." Durham attributed to Lloyd the statements that "[I]f you stick with me, you will be out in a year * * * (and) * * * any sentences you will be tried on will be run currently [7] [sic] * * " Durham testified also that Lloyd told him he would "go to the limits to get me a pardon" if Durham would tell Lloyd what he knew about various unsolved crimes, including the Double Toll Gate murders.

At trial, Lloyd flatly contradicted the statements imputed to him by Durham, testifying that he never made promises to Durham or held out any efforts to obtain a pardon for him. He stated that he first learned that Durham might know something about the Double Toll Gate murders when he and Craft went to the penitentiary on June 23, 1964 to question Durham in regard to a murder in Loudon County. During the discussion of the Loudon County case, Lloyd testified, it came to Craft's attention that Durham was talking about the Double Toll Gate murders. Lloyd's testimony was corroborated in every material respect by Craft.

6. According to Roberts' testimony, Hall specifically mentioned only Dinwiddie County as an example of Durham's helpfulness in solving other crimes. Durham had, a month earlier, confessed his involvement in a Dinwiddie County murder. His subsequent conviction for that murder was remanded for a new trial by the Supreme Court of Appeals for a failure to give the warnings now required by *Miranda*. Durham v. Commonwealth, 208 Va. 415, 158 S.E.2d 135 (1967).

7. Durham asserts that, after he began cooperating with Lloyd, all sentences which he thereafter received upon his pleas of guilty to charges of breaking and entering in various Virginia counties were made to run concurrently. His prison record belies his testimony and discloses that all but two of the seven concurrent sentences which he has received were imposed prior to Durham's first confession of his involvement in the Double Toll Gate slayings, the latest of these being imposed three months before his confession of June 23, 1964.

As noted earlier, Lloyd had advised Durham prior to taking the June 23rd statement that he was entitled to counsel and that he did not have to make any statement. Lloyd testified further that he also advised Durham that, if Lloyd or Craft asked him any questions which he did not want to answer, to say so. Durham's June 23rd statement contains in its preamble his acknowledgement that he had not been promised any rewards. The statement itself, a transcription of questions asked Durham and his answers, contains the following:

"***Q. Have you been made any promises to make this statement?

A. No, sir.

Q. Are you making this statement of your own free will?

A. Yes. That's the only way you can get it.

Q. Has anyone told you that the court would be more lenient on you if you made this statement?

A. No."

Durham admitted answering as above and affirmed that neither Lloyd nor Craft made promises of any kind on June 23rd to get him to tell about the Double Toll Gate killings. He admitted also that they explained to him that no promises or rewards were being offered to him.

The interrogation of June 23rd, including the time taken to transcribe the questions and answers, took only about two hours. Both Lloyd and Craft testified that Durham, after making the statement, volunteered to take them back to Double Toll Gate and reenact the crime. They returned on July 14 for that purpose. Lloyd stated that, before leaving the penitentiary, he advised Durham that he did not have to go. Both officers maintained at trial that no promises or threats were made to induce Durham to go.

■ The court is unconvinced, on the facts before it, that petitioner's confession of June 23rd and his oral statements of July 14th were involuntary and finds as follows: Neither the confession nor the reenactment was a product of prolonged or repeated interrogation. They were elicited during or following relatively short periods of questioning not even remotely resembling the modes of interrogation condemned in Clewis v. Texas, *supra* (38 hours of intermittent interrogation), and Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (repeated interrogation over 16 days). See also Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), and Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1967). Durham was timely advised on both occasions that he did not have to make any statements.[8] He has nowhere specifically denied this, and his claim that he was not advised of his "absolute constitutional right to remain silent" is nothing more nor less than a semantical argument in which the court will not indulge. Nothing in the record indicates that Durham suffered a disadvantage due to his age or educational level, or that he was unaware of his rights at any stage of the events surrounding his confessions.

Durham's claim that his statements were induced by promises of leniency would, if substantiated, render them inadmissible. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); Malloy v. Hogan, *supra*. The court believes from the record, however, that no such promises were made. The discussion of a pardon among Durham, his attorney Roberts, and Investigator Hall took place over a month before Durham confessed to Lloyd and Craft. The import of that discussion was that efforts toward a pardon would be

---

8. It thus need not be decided whether, under *Escobedo*, the failure to give such warning would of itself require exclusion of Durham's statements. Cf. State of Texas v. Payton, 390 F.2d 261 (5th Cir. 1968).

undertaken by Roberts and Hall if Durham would reveal the names of others whom he had previously implicated in the Stafford County murder case. There was no mention then of the Double Toll Gate murders. Roberts' advice to Durham that he cooperate with police in solving "other crimes" emphasized that efforts toward a pardon could be made only if Durham was not implicated in such crimes. Durham's assertion that Lloyd promised him leniency in exchange for his confessions is unconvincing. It was contradicted at trial by Lloyd's and Craft's testimony to the contrary. The trial judge properly decided the issue against petitioner and his determination is ordinarily taken to resolve such evidentiary conflicts. Haynes v. Washington, *supra*. In this court's opinion, petitioner has not, as he must, proven his allegation by a preponderance of the evidence. Cf. Hall v. Warden, Maryland Penitentiary, 313 F.2d 483 (4th Cir. 1963), cert. den., Pepersack v. Hall, 374 U.S. 809, 83 S.Ct. 1693, 10 L.Ed.2d 1032.

To summarize. The court concludes that petitioner's confession of June 23rd and his reenactment of July 14th were neither the products of inducement by promises of leniency nor, considering all the attendant circumstances, otherwise involuntary.

▮▮▮▮ As applied to his third and fourth statements, petitioner's claims of involuntariness and denial of the right to counsel fail for other reasons. The Attorney General, conceding that the fourth confession would ordinarily be inadmissible by virtue of the agreement upon which it was based, urges that both the third and fourth confessions were properly admitted at trial because the petitioner "opened the door" to their admission. His position is well taken. The trial transcript discloses that the substance of Durham's written confessions of July 14, 1964 and March 15, 1965 was first inquired into by his defense counsel upon cross-examination of Investigator Craft. The trial judge had earlier properly ruled that the prosecution could not introduce the fourth state-

ment, but held, correctly, that nothing prevented the defendant from putting it into evidence. Once defense counsel had opened the inquiry as to the contents of the third and fourth statements, the trial judge permitted the Commonwealth, on redirect examination of Craft, to introduce into evidence the two statements in their entirety. In so doing, he merely gave effect to the well settled rule of evidence that, when any part of a written statement has been put in evidence by one party, the opponent may afterwards, on re-examination, put in the remainder thereof. VII Wigmore on Evidence §§ 2094, 2113, 2115 (3d Ed. 1940). See also Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Defense counsel's strategy in developing the subjects of Durham's third and fourth statements is apparent from the record. He attempted to demonstrate that the detailed description of the crimes contained in Durham's third statement was based not upon Durham's knowledge of the crimes but upon his visit to the scene of the crimes just prior to the taking of the statement. He had tried to prove throughout the trial that Durham's familiarity with the scene of the slayings was wholly the product of suggestion by the police. Finally, by questioning Craft as to the contents of the fourth statement, which, for the first time, named Easter as Durham's accomplice, counsel apparently hoped to direct the jury's attention to inconsistencies in Durham's statements and thereby render them unworthy of belief. The strategy was deliberate and knowing. Counsel's tactical choice to "open the door" to admission of the statements, aside from bringing the above-mentioned evidential rule into play, thus amounted to a waiver, binding on petitioner, of any constitutional claims as to their admissibility. Mathis v. People of State of Colorado, 425 F.2d 1165 (10th Cir. 1970); Cf. Henry v. Mississippi, 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Petitioner is therefore entitled to no relief on account of such claims.

Upon careful consideration of Durham's third and remaining allegation, that he was not afforded trial by an impartial jury, the court is of opinion that it requires relief. The gravamen of petitioner's complaint is that a venireman, Huyett Light, was allowed to sit on the panel of jurors who tried his case. At the *voir dire* examination of prospective jurors, the following took place:

Mr. Simpson (defense counsel): Did any of you know either Mrs. Annie Snow or Mrs. Waltine Naomi Hoover?

Venireman Light: (Raising hand)

Mr. Simpson: Mr. Light?

Venireman Light: Yes, sir, I knew her.

Mr. Simpson: Do you know both of them?

Venireman Light: No, I just knew Mrs. Hoover.

Mr. Simpson: How long had you known Mrs. Hoover?

Venireman Light: Oh, about 5 or 6 years.

Mr. Simpson: How well did you know her?

Venireman Light: Well, enough to talk to. We used to board at Daniel City at the beach together and talked to Mr. and Mrs. Hoover a couple of hours and other occasions.

Mr. Simpson: Would you say that you were a close friend?

Venireman Light: Just a friend, not a close friend.

Mr. Simpson: Would the fact that you knew Mrs. Hoover and that you were a friend of hers in any way influence your thinking or deliberation *in this case*?

Venireman Light: Well, I thought she was a lovely person.

Mr. Simpson: Do you think that the fact that she was killed on the same day as Mrs. Snow, that this might influence your knowledge of her and knowing her that this might influence your thinking and deliberation?

Venireman Light: *It would still be there.*

Mr. Simpson: If the court please, I would ask that this juror be excused.

The Court: Mr. Light, are you saying that you are so prejudiced and biased in this case that you could not render the accused a fair trial in consideration of the evidence?

Mr. Simpson: If the court please, may I approach the bench?

Venireman Light: I knew Mrs. Hoover and fairly well, not real well, but fairly well, and I heard a lot of it.

The Court: Did you understand my question?

Venireman Light: Yes, sir.

The Court: That knowledge of her, does that create in your mind such a bias that you could not give the accused a fair trial in this case in consideration of the evidence?

Venireman Light: *I guess not.*

The Court: You say you guess not?

Venireman Light: *Yes, sir. Something would be there. I don't know.*

Mr. Simpson: I would object to the form of that question.

The Court: Your objection is overruled.

Mr. Simpson: Exception.

The Court: Exception noted. I don't find the juror disqualified. [Italics added.]

Simpson duly excepted to the seating of Venireman Light.

■ Both the Virginia and federal constitutions [9] secure the right of an accused to trial by an impartial jury. An impartial jury, moreover, being fundamental to a fair hearing in a fair tribunal, is a basic requirement of constitutional due process. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961).

"There is no right more sacred to our institutions of government than the right to a public trial by a fair and impartial jury; no wrong more

---

9. Va.Const. Art. I, §, 8; U.S.Const. Amend. VI.

grievous than its denial, and no greater duty is enjoined upon the courts than to preserve that right untarnished and undefiled. The denial of a fair and impartial trial, as guaranteed by the 6th Amendment to the Constitution, is also a denial of due process, demanded by the 5th and 14th Amendments, and the failure to strictly observe these constitutional safeguards renders a trial and conviction for a criminal offense illegal and void and redress therefor is within the ambit of habeas corpus." Baker v. Hudspeth, 129 F.2d 779, 781 (10th Cir. 1942), cert. den. 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546, quoted with approval in Lane v. Warden, Maryland Penitentiary, 320 F.2d 179, 186 (4th Cir. 1963).

To be impartial, a juror must, in the language of Lord Coke, " * * * be indifferent as he stands unsworn." [10] Co. Litt. 155b. There are no settled rules for determining, in a particular case, whether a juror fulfills this requirement.

"Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." United States v. Wood, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936).

Some guidance in the matter was offered by Chief Justice Marshall in 1 Burr's Trial 416 (1807):

"Light impressions which may fairly be supposed to yield to the testimony that may be offered; which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force, do

constitute a sufficient objection to him." *As quoted in* Reynolds v. United States, 98 U.S. 145, 155, 25 L.Ed. 244 (1878).

█ The conclusion to be drawn from these principles is that the disqualifying nature of a juror's impression lies not so much in the particular content of the impression as in its weight upon the juror's mind. The touchstone must be the juror's ability to lay the impression aside, whatever it may be, and to base his verdict upon the law and the evidence alone. The ascertainment of whether and to what extent a particular juror possesses this quality must, of necessity, depend almost entirely upon his own acknowledgments. As it has long been recognized in Virginia, "[T]he juror is, most commonly, the best judge of whether or no his prepossessions amount to a decided opinion." Armistead's Case, 38 Va. (11 Leigh) 657 (1841). In Clore's Case, 49 Va. (8 Grat.) 606 (1851), the Virginia Supreme Court of Appeals upheld the exclusion of a juror who had expressed conscientious scruples against capital punishment and who, in reply to the question of whether he would convict the defendant if the evidence proved him guilty, said that he "did not know." The court there stated:

" * * * [W]as this opinion or scruple of such influence as to 'prevent' him from 'convicting the prisoner?' The court could not know; and the juror himself, according to his examination, did not know that the evidence proving murder in the first degree, or his loyalty, or the obligations of the oath to find according to evidence, would control or overcome the influence of his conscientious scruples. Such being the state of the juror's mind, it was most proper to regard him as excluded * * * from serving as a juror." 49 Va. at 615–616.

In Dejarnette v. Commonwealth, 75 Va. 867 (1881), the court held incompetent a

10. By statute in Virginia, a prospective juror who "does not stand indifferent in the cause" must be excluded from the

jury trying that cause. Va.Code Ann. § 8–199.

juror who related on his *voir dire* examination that he had earlier formed a hypothetical opinion about the case but that " * * * he could not say now that he had such an opinion that evidence could not remove it * * *" 75 Va. at 870. The court in *Dejarnette* stated:

> "The material point for our consideration in the answer of the juror is his inability or unwillingness to state how far his judgment would be affected by his preconceived opinions. His response to the inquiry of the court was that he could 'not now say that he had such opinion that evidence would not remove it.' Nor did he say that the opinion was of such a character that evidence would remove it. In other words, he was in doubt whether the opinion he had formed would yield to the testimony to be adduced on the trial. *If the juror was in a frame of mind which would enable him to render an impartial verdict, uninfluenced by his previous impressions, it is but fair to presume that he would have so declared. The fact that he did not, or was unable to do so, and thus solve the doubt, was sufficient to disqualify him.*" 75 Va. at 870. [Emphasis supplied.]

See also Washington v. Commonwealth, 86 Va. 405, 10 S.E. 419 (1889); Parsons v. Commonwealth, 138 Va. 764, 121 S.E. 68 (1924).

Further scrutiny of Virginia cases in point discloses that, in every case found in which the seating of a juror challenged for bias has been upheld, the challenged juror had, upon his *voir dire* examination, stated unequivocally in one form or another that he could render a fair and impartial verdict uninfluenced by his pre-formed impression.[11] See also Holt v. United States, 218 U.S. 245, 31

S.Ct. 2, 54 L.Ed. 1021 (1910); Spies v. Illinois, 123 U.S. 131, 8 S.Ct. 21, 31 L.Ed. 80 (1887); Reynolds v. United States, *supra;* Assaid v. United States, 10 F.2d 752 (4th Cir. 1926).

In the present case, the court finds inescapable the conclusion that Durham's right to a fair and impartial trial was denied him when venireman Light was permitted to sit on the jury which convicted him. By his answers to the questions propounded him on the *voir dire*, Light repeatedly indicated his inability or unwillingness to cast aside his impressions and to give Durham a fair and impartial trial. Even in response to the question of whether his knowledge of one of the deceased created in his mind

" * * * such a bias that [he] could not give the accused a fair trial * * *," Light equivocated: *"I guess not."* Pressed further, he again added: *"Something would be there. I don't know."* Light doubted his own ability to try Durham's case uninfluenced by his impressions. It is unreasonable to require the defendant to trust him. In the words of Judge Story:

> " * * * [T]o insist on a juror's sitting on a cause when he acknowledges himself to be under influences, no matter whether they arise from interest, from prejudices, or from religious opinions, which will prevent him from giving a true verdict according to law and evidence, would be to subvert the objects of a trial by jury, and to bring into disgrace and contempt, the proceedings of courts of justice. We do not sit here to procure the verdicts of partial and prejudiced men; but of men, honest and indifferent in causes. This is the administration of justice which the law re-

---

11. Sprouce's Case, 4 Va. (2 Va.Cas.) 375 (1823); Osiander's Case, 30 Va. (3 Leigh.) 780 (1831); Moran's Case, 36 Va. (9 Leigh.) 651 (1839); Maile's Case, 36 Va. (9 Leigh.) 661 (1839); Epes' Case, 46 Va. (5 Grat.) 676 (1848); Clore's Case, 49 Va. (8 Grat.) 606 (1851); Jackson v. Commonwealth, 64 Va. (23 Grat.) 919 (1873); McCue v. Commonwealth, 103 Va. 870, 49 S.E. 623 (1905); Robinson v. Commonwealth, 104 Va. 888, 52 S.E. 690 (1906); Slade v. Commonwealth, 155 Va. 1099, 156 S.E. 388 (1931); Ballard v. Commonwealth, 156 Va. 980, 159 S.E. 222 (1932); Cox v. Commonwealth, 157 Va. 900, 162 S.E. 178 (1932); Abdell v. Commonwealth, 173 Va. 458, 2 S.E.2d 293 (1934).

quires of us; * * *." United States v. Cornell, 25 Fed.Cas. 650, 655 (1820).

The courts must thus zealously guard the precept that only jurors free from partiality may sit at trials. Upon the issue of whether a particular juror is so qualified,

" * * * [n]othing should be left to inference or doubt. * * * If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion. For, it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible." Wright v. Commonwealth, 73 Va. (32 Grat.) 941, 943 (1879).

To summarize: A juror who cannot unequivocally state, at the time of the trial, that he can give a defendant a fair and impartial trial, and whose answer, in response to questions concerning his bias, concludes with "Something would be there. I don't know.", is not an impartial juror within the meaning of the Sixth Amendment.

Accordingly, the court must reluctantly grant the relief prayed for, and order that the petitioner either be granted a new trial or released.