### STEVENSON v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit.    March 15, 1898.)

No. 620.

**1. CRIMINAL LAW—MURDER—DECLARATIONS.**
Evidence as to the declaration of the defendant, made three months prior to the homicide, that he "intended to kill the next deputy marshal that arrested him," was improperly admitted, as too remote and general to have any legitimate bearing on the issue to be tried.

**2. SAME.**
Where conversations and declarations of the accused, after arrest, forming no part of the res gestæ, and not admissible in his behalf, but admissible against him, are proved by the United States, the accused is entitled to have the full conversation or conversations given in evidence.

**3. SAME—INSTRUCTIONS—ABANDONMENT OF QUARREL.**
Where there is evidence tending to show that the accused, after provoking a quarrel with deceased, withdrew therefrom, and was thereafter fired upon without warning by deceased, whom he then shot and killed, it is the duty of the court to instruct the jury as to the effect of such withdrawal, and its refusal to do so when requested is reversible error.

**4. SAME—JURISDICTION—AVERMENTS IN INDICTMENT.**
Where an indictment for murder in the Chickasaw Nation, Ind. T., avers that both deceased and accused were white men, proof that deceased was a white man establishes the jurisdiction, and the averment as to citizenship of the accused is surplusage.

Swayne, District Judge. dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

John Stevenson, the plaintiff in error, was, on the 1st day of December, 1893, at a term of the United States circuit court for the Eastern district of Texas, indicted for the murder of one Joe Gaines. On May 13, 1897, he was put upon his trial, and on May 20th was convicted of manslaughter. His amended motion for a new trial was overruled. His motion in arrest of judgment was overruled. The sentence of the court was imprisonment at hard labor for the term of six years and ten months from June 2, 1897, in the Detroit House of Correction, situated at Detroit, in the Eastern district of Michigan, and, besides, a fine of $50 and all costs of this proceeding. The indictment in the usual form charges the murder as committed in Pickens county, Chickasaw Nation, Ind. T., with the further allegation that both the plaintiff in error and the deceased were then and there white persons, and not Indians, nor citizens of the Indian Territory. The evidence of the trial tended to show the facts substantially as follows: The place of the homicide was the town of Paul's Valley, in the house and business place of one W. R. Bandy, situated on Main street, which runs

north and south parallel with the Santa Fé Railroad.  Bandy's place is in the
north part of the town, and fronts east on Main street.  The building is 18 feet
by 36 feet, with a front double door and window south of door in east wall.
On the night of the homicide the house was well lighted, and a counter was in
the southeast corner, with passage room between it and the south wall.  Under-
wood's drug store is 175 feet south of Bandy's, and the Central Hotel several
hundred feet south of Underwood's drug store.  Miller & Berry's drug store is
still further south of the hotel several hundred feet.  All of the buildings are
practically, with their fronts, on a line, and face the east and the railroad.
Plaintiff in error was legally adopted by the Chickasaw Nation, and his wife,
a full-blood Chickasaw, was engaged in the restaurant business in Paul's Valley.
The deceased was a constable and deputy marshal for the territory courts.  In
May prior to the homicide the plaintiff in error, when talking to a Mrs. Joe
Paul about deputy marshals, said that he was getting tired of being pulled
around by them, and was going to kill the next one that arrested him; but no ref-
erence was made to the deceased, nor was it known that plaintiff in error
knew him.  On the 22d of August, 1893, the plaintiff in error was refused by
United States Commissioner Davidson as surety on a bond.  About dusk that
evening he took from the house of Mrs. Sarah Paul a Winchester.  She tried
to take the gun from him, and he told her not to be uneasy, he was only going
to carry it to his restaurant.  She thought her son was in trouble.  Subsequent
to this, and about 8:30 o'clock that evening, the plaintiff in error saw Davidson,
the commissioner, in Underwood's drug store, and cursed him for refusing to
take him on the bond, telling the commissioner that he had taken a man in
preference to him who could not schedule a horse.  Leaving the drug store, he
cursed on the sidewalk as he was going off with one Black.  At this juncture the
deceased came into the drug store, was told by the commissioner of plaintiff in
error's conduct, and in about 10 minutes thereafter overtook the plaintiff in error
and John Black while they were going home, and talking about a matter of
business.  Hot words occurred between the two, when the deceased drew his
pistol, and presented it to the back of plaintiff in error, and would have shot
him, but for the interposition of one Robinson.  The deceased arrested the plain-
tiff in error without a warrant, but released him at the Central Hotel.  The
plaintiff in error then started home in company with his wife, and en route told
Alex Smith (a posse man of deceased) that he would go home, get his gun, come
back, and kill the sons of bitches.  He went to his house, west of Main street,
and found a couple of visitors there,—Mr. and Mrs. Waite; then went to his
restaurant, which is between his house and Miller & Berry's drug store, prepared
supper for his guests, and took it to his house.  After supper (and, the inference
is, as he was leaving home then) Ann Palmer, who lived close by, says she
heard him say he was going to get his Winchester, and shoot it out with David-
son, but did not hear him mention anything about the deceased, and only called
Davidson's name once.  Mrs. Waite never heard Davidson's or anybody else's
name mentioned by the plaintiff in error, but, as her husband was sick, she
requested him to get quinine for him.  He was next seen at Miller & Berry's
store about 25 minutes before the homicide, where he asked for quinine, and
bought some bitters.  Arch Matthews invited him to go to Whitehurst (National
Hotel) with him, and get some good whisky.  This hotel being east of the rail-
road depot, they started for the hotel, but plaintiff in error, being as "drunk as
a goat," was left on some trucks at the depot to wait for the whisky.  Matthews
not returning promptly, the plaintiff in error left the trucks, and started to
Bandy's place, and somewhere between the depot and Bandy's place he fired his
Winchester twice in the air, and hallooed, "Hide out, Stevenson is in town yet,"
or words of similar import.  He then went into Bandy's place, and, when first
going in was a little angry, but soon got in a good humor, and invited everybody
to drink with him.  Bandy walked behind his counter to serve the drinks, and
plaintiff in error walked up to the counter with his face to the south.  When
the street shots were fired, Davidson and the deceased were seated in a room in
the Central Hotel.  The two shots and something like a whoop were heard by
Davidson, and, when they were made, the deceased, without saying a word, arose
from his seat, got his pistol, and started in the direction of Bandy's place.
Deceased was seen going rapidly towards Bandy's, and as he neared the house
he was seen in a stooping position, with his pistol in both hands, and as he ap-

proached the south facing of the double door he suddenly wheeled to the left, extended both of his arms with the pistol in his hands, and fired at plaintiff in error, the bullet passing closely in front of plaintiff in error, and lodging in the counter. The plaintiff in error was standing at the time at the counter, preparatory to drinking, his gun at his right side; and, as the deceased fired, he threw his gun across his left arm, and fired, without putting it to his shoulder, or taking aim. The two shots were close together, but the first one was fired by the deceased. There were two gunshot wounds upon deceased made by one bullet. The ball first entered the outside of the left arm about the wrist, and passing through came out on the opposite side of the arm about two inches higher than the point of entrance and entered the body near the left breast. After the shooting, plaintiff in error went out by rear door to his home; had his Winchester with him, and told the people in his house that he had had a shooting scrape; that he was not hurt, and did not know whether the other person got hurt or not, no name being mentioned indicating who the other person was. He then left, saying he would give himself up to the officers.

On the trial the government introduced the evidence of one Scrivener, as follows: "After the killing, I was sent for, and went to where the defendant was, in the rear of the place where the shooting occurred, and walked up to him, and said to him, 'John, it was a pretty bad affair, and you ought to be sorry for this.' He said to me that all he regretted about it was that he did not kill that other son of a bitch, Bluff Davidson. He was talking when I went up to him, and said something about being in danger. I told him not to talk; that any statement made might be used against him. He said he shot at the man that had shot at him. He just fired his gun at the blaze from the door, and he said it was Gaines that shot at him, and when he shot it was in defense of his life. He further said that he would do the same thing again under the same circum-. stances. Witness stated that no threats or promises or inducements of any kind were made to defendant, but that what was said to him was voluntarily said by defendant." In connection with this evidence the plaintiff in error offered the evidence of one Alexander Smith as to the conversation between the witness and himself at the time just preceding the said Scrivener's approach to the party, to the effect that the witness Smith had opened a conversation with the plaintiff in error, saying to him, "John, you have killed the man," and plaintiff in error replied, "Who is it?" and the witness said "Joe Gaines," whereupon the plaintiff in error replied, "I wish it had been that other son of a bitch, Bluff Davidson;" immediately upon which the government's witness, Scrivener, came up, and continued the conversation as testified to by him. To the introduction of this evidence by Alexander Smith objection was made, and the court excluded the same upon the ground that it was self-serving, and not a part of the res gestæ, nor in explanation of the other declarations in evidence. To this ruling of the court exceptions were duly taken. Further, on the trial the court, over the objection of the defendant, permitted a government witness (Mrs. Joe Paul) to testify that she was at the National Hotel in Paul's Valley, and heard defendant say, in May, 1893, "that he intended to kill the next damn marshal that arrested him; that he was tired of being pulled around by them"; which testimony was admitted by the court as showing the feeling of defendant against marshals as a class, and so instructed the jury at the time, which ruling of the court was duly excepted to. After the evidence, the counsel for plaintiff in error asked the court to instruct the jury in some twenty-six propositions of law, besides two special instructions, all and each of which the court refused, because the law applicable to the case was given in the main charge; but this does not appear by any proper bill of exceptions. A regular bill of exceptions does show that on the trial of the cause, and after argument of the counsel, and after the submission of the main charge of the court, the plaintiff in error requested the court to charge the jury as follows: "If the jury believe from the evidence, or have a reasonable doubt of it, that at the time of the homicide the defendant was, previous to and at the time of said homicide, in the public business place of the witness Bandy, you are instructed that the defendant had the legal right to be in said place; and if, when in said place of business, he (the defendant) was not engaged in any act or conduct that showed in itself malice towards Gaines, or a purpose to engage Gaines (the deceased) in an altercation with him, and if at said time, the defendant thus circumstanced, the deceased approached with a deadly weapon, and the

defendant did not know of said approach, or of the purpose of said Gaines in making said approach, and at said time the deceased, Gaines, suddenly appeared at the door of said place with a deadly weapon, and without warning to defendant of his presence and purpose, he, with said weapon, fired or attempted to fire upon the defendant, then you are instructed that the defendant had the right to shoot and kill the deceased, and should be acquitted." This charge was refused by the court for the reason that the proposition of law contained therein was covered by the main charge. Among other things in the main charge was the following: "The right of self-defense exists at all places and under all circumstances. Where the party charged with the offense has been wrongfully assailed by his adversary, and placed in a position of great peril, or a position from which. situated as the party charged with the offense believes and has a right to believe, or any reasonable person situated as he was would have a right to believe, that his adversary then intended to take his life, or do him serious bodily harm, and acting upon such appearances, and from that cause only, and in order to save his own life, or prevent either his life being taken or an act being done that likely would take his life, he has a right to act on those appearances, and repel force by force, even to the extent of taking human life, if necessary. In regard to that matter I will instruct you further on. * * * It appears from the testimony in this case that he did arrest Mr. Stevenson on the outside of that building, down the street somewhere; that Mr. Stevenson had a knife, and that the officer had a pistol, and that there were some words between them,—some trouble between them,—but finally that Mr. Stevenson put down the knife, and that the officer turned him loose, and then, on account of something that was said, rearrested him, then afterwards, down by the hotel, turned him loose again. Whether those arrests were lawful or unlawful, Mr. Stevenson had been released by the officer under the undisputed testimony in this case, is the way I remember it. Of course, upon all these questions, gentlemen, if you don't remember the evidence as I do, follow your recollection, not mine, because it is a question of fact for you to determine, not for me. I only mean to speak of those matters that I understand to be undisputed, not upon controverted questions; and in determining those questions you are to consider the subsequent conduct of the parties. If Stevenson went off,—if you find it is a fact that he went off,—and got a Winchester, and came back, and fired it in the streets, and called out, made exclamations of any kind, and you believe that Gaines, the officer, heard those remarks, heard those shots, and knew who the party was,—then you are instructed that that was in his presence, within the contemplation of that statute, and it was his duty to arrest the party creating the disturbance or breach of the peace. If he did not hear the remark, did not know who it was, then he had no right to make the arrest without a warrant, or attempt to make it without a warrant; but that is a question in this case that you are to determine from the evidence, but, if Gaines did know who it was, did hear him make the remark, heard the shots, and knew who the party was, it was in his presence in contemplation of the law, and he had a right to go where the defendant was for the purpose of arresting him; and if, on account of what had occurred previously between him and Mr. Stevenson, he had a right to apprehend danger from Mr. Stevenson in attempting to make the arrest, he had the right to go prepared to act promptly in the event of an emergency. What I mean is this: he had a right to take his pistol in his hand in going to make that arrest, if, from what had occurred previously between the parties, he had a right to believe that Stevenson would resist the arrest. When he went to where the defendant was, it was his duty as an officer to inform him of his purpose,—that is, that his purpose was to arrest him,—that was his duty. If he did not do it, but simply went there and fired upon Stevenson for the purpose of killing him, and not for the purpose of arresting him, then Stevenson would have the right to shoot Mr. Gaines in order to save his own life, and he would not be guilty of murder in this case, unless you believe from the testimony that Mr. Stevenson had gone off, and armed himself with a Winchester, and had come back, and fired the shots, for the purpose of inducing Gaines to attempt to arrest him, in order to get to kill him; if you believe from the testimony that Stevenson did that,—those acts, —and did it for the purpose of inducing Gaines to attempt his arrest in order to get an opportunity to take his life, then it is immaterial who fired the first shot, and the defendant in that state of case, if you believe those to be the facts,

would be guilty of murder, and could not invoke the law of self-defense, because it would be taking advantage of his own wrongs. * * * If the evidence satisfies you that Gaines went there for the purpose of arresting him, and that when he approached the door with his pistol in his hand, if you believe from the evidence that Stevenson immediately shot him, then the defendant would be guilty of murder or manslaughter, or not guilty of anything, owing to how you determine certain facts. If he went there for the purpose of arresting him, and not for the purpose of killing him, but with his pistol in his hand, if the officer, without informing Stevenson of his intention, made some demonstrations which induced Stevenson to think that he was then going to shoot him, and not arrest him, and he fired in consequence of that, why then Stevenson would be acting in self-defense; but, if Stevenson had fired the shots in the air, and gone into this place for the purpose of inducing the officer to come there in order to get to kill him when he did approach, it would not make any difference whether Gaines fired first or whether Stevenson fired first; in that state of case he would be guilty of murder. If you believe from the evidence that the officer went there to arrest him, and not kill him, and that Stevenson had not procured his gun and fired the shots for the purpose of invoking the difficulty, or inducing the officer to attempt to arrest him, but simply was mad and angry, and believed that he had been mistreated by Davidson in refusing to take him on the bond, and believed that he had been mistreated by the officer in the arrest that had been made by him, and you believe that was an adequate cause for that state of mind upon his part, and when he saw him, acting from those impulses, and those only, he shot him as soon as he saw him,—then he would be guilty of manslaughter, and not of murder." What is here given is substantially all that is contained in the charge of the court bearing upon the law of self-defense as applicable to the case in hand.

Stillwell H. Russell and Moman Pruiett, for plaintiff in error.

J. Ward Gurley, U. S. Atty.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

After stating the facts as above, PARDEE, Circuit Judge, delivered the opinion of the court.

Counsel for the plaintiff in error have presented 15 alleged assignments of error, some of which are in accordance with the rules of this court in regard to assignments of error, but many of them are altogether too prolix and argumentative, and we shall therefore consider the case from our own point of view, dealing only with those alleged errors clearly and specifically assigned. The evidence of Mrs. Joe Paul with regard to the declarations of the defendant made some three months prior to the homicide was improperly admitted. It was too remote and general to have any legitimate bearing on the issues to be tried. The case does not show, nor even tend to show, that the deceased, Joe Gaines, acted as a deputy marshal, or that he was known to the plaintiff in error at any time as a deputy marshal, but rather tends to show—and that was the view of the trial judge—that Joe Gaines, in attempting to arrest the defendant prior to the homicide and afterwards at the homicide, was acting as a constable, and not as a deputy marshal. The evidence as admitted was calculated to prejudice the accused before the jury, by showing his reputation as a brawling, turbulent man. The conversations and declarations of the accused after his arrest formed no part of the res gestæ, and in his behalf were inadmissible, but they were admissible against him if the prosecution saw fit to avail itself of them, and when the United States

proved the conversations and declarations the accused was entitled to have the full conversation or conversations given in evidence. This we understand to be elementary. The case clearly shows that what Scrivener heard defendant say after the homicide was intimately and directly connected with the conversation between the accused and witness Smith, and, as the part Scrivener heard was offered in evidence, the whole, on the request of the accused, should have been admitted. Where one part of a conversation is introduced, the other party is entitled to all that relates to the same subject, and all that may be necessary to fully understand the portion given. 1 Bish. Cr. Proc. § 1241; Carver v. U. S., 164 U. S. 694, 696, 17 Sup. Ct. 640. There was evidence admitted on the trial tending to show that at, and some little time before, the homicide, the plaintiff in error had abandoned his controversy with the deceased, Gaines, and was not at the time engaged in any acts, nor making any declarations, showing malice towards the said Gaines, nor showing a purpose thereafter to engage Gaines in any altercation or quarrel for any purpose; and that during this period, in which the plaintiff in error had abandoned the previous purpose to quarrel with Gaines, he was approached and attacked and fired upon without warning on the part of Gaines, and thereupon he shot and killed Gaines in self-defense.

We are not called upon to show how consonant this evidence is with the other, and, perhaps, more important, facts in the case, but it was the theory of the defense in the court below, and, as there was evidence tending to substantiate it, that theory should have been recognized by the judge in his charge. We therefore conclude that the requested charge, to wit: "If the jury believe from the evidence, or have a reasonable doubt of it, that at the time of the homicide the defendant was, previous to and at the time of said homicide, in the public business place of the witness Bandy, you are instructed that defendant had the legal right to be in said place; and if, when in said place of business, he (the defendant) was not engaged in any act or conduct that showed in itself malice towards Gaines, or a purpose to engage Gaines (the deceased) in an altercation with him, and if at said time, the defendant thus circumstanced, the deceased approached with a deadly weapon, and the defendant did not know of said approach, or of the purpose of said Gaines in making said approach, and at said time the deceased, Gaines, suddenly appeared at the door of said place with a deadly weapon, and without warning to defendant of his presence and purpose, he, with said weapon, fired or attempted to fire upon the defendant,—then you are instructed that the defendant had the right to shoot and kill deceased, and should be acquitted,"—was proper to be given to the jury, and applicable to the case under consideration. The judge of the lower court apparently was of the same opinion, but excused himself from giving it, and refused the same, because it was incorporated in the main charge. We seek for the requested instruction, or its equivalent, in the main charge, but without success. There is in the main charge, as shown in the statement of this case, an instruction as to the law of self-defense, in which the general rule is correctly stated, but the instruction is not made specifically applicable to

the facts in the case as claimed by the accused on trial, and is coupled with the remark that the jury will be instructed on the same subject further on.   Further on in the charge, wherein the law of self-defense is dealt with as specifically applicable to the case in hand, great stress is laid upon the altercation previous to the homicide between the plaintiff in error and the deceased, without any reference to the contention that after such altercation and threats of continuing the same, the plaintiff in error had abandoned the further prosecution of the quarrel; and, in our opinion, in this part of the charge too much stress is laid upon the frame of mind and intentions of the deceased, which could not have been known to the plaintiff in error, and too little stress is laid upon the frame of mind and intentions of the plaintiff in error at the time of the homicide.   In all cases where the court is warranted in submitting the law on facts showing that a difficulty with his adversary was provoked on the part of the accused, if there be evidence tending to show that the accused, after provoking his adversary, abandoned his purpose, and withdrew from prosecuting the same, it is the duty of the court to also instruct the jury as to the effect resulting from such abandonment of purpose, called for by such evidence; and the refusal to give such instruction, when specially requested, is reversible error. U. S. v. Rowe, 164 U. S. 546, 17 Sup. Ct. 172.

The charge of the court was objected to in the lower court, and the objections are again urged here, upon the grounds that, while it elaborates and impresses upon the jury the theory of the prosecution, it does not sufficiently give the rules of law applicable to the theory of the defense, which theory was based upon evidence in the case; that it tended to impress the jury with the proposition that, if ill feeling or malice existed upon the part of the plaintiff in error towards Commissioner Davidson, it necessarily included enmity towards the deceased, and served to make the enmity towards Davidson a standard, or test, determining malice, hot blood, and evil design towards the deceased; and that, if there existed in the mind of the plaintiff in error prior to and at the time of the homicide an intention to provoke an altercation with the deceased, with a view of getting a chance to kill him, then the deceased, Gaines, had a right, as a peace officer, to come suddenly upon the plaintiff in error, and without warning, or any attempt to make an arrest, fire upon and kill him.   These objections, while perhaps not urged in the lower court in such a way as to fully authorize their consideration in this court, are serious objections to the charge as given; and, if not treated here as constituting reversible error, it must not be understood that in this court all the propositions of the charge as given, and not specifically held ground for reversal, are approved; and particularly is this the case with regard to the method in which, conceding all the facts of the case as claimed on the trial by the prosecution, the deceased, Gaines, undertook to arrest the plaintiff in error. While the conditions of border society may be such that peace officers, authorized to arrest disturbers of the peace with or without warrants, are frequently compelled to shoot down on very short notice brawlers and disturbers who are armed with deadly weapons, yet we are not prepared to hold that in law such shooting without warning is justi-

fiable, particularly where, as in the present case, opportunity exists to collect a sufficient posse, and make an arrest by an immediate show of overwhelming force.

The indictment alleges as follows: "That said Joe Gaines, and he, the said John Stevenson, being then and there white persons, and not Indians, nor citizens of the Indian Territory." The proof shows that Joe Gaines was a white man, and not a citizen of the Indian Territory, but further shows that John Stevenson, the plaintiff in error, had not only married a full-blooded Chickasaw, and was living with her as his wife, but that he was a citizen of the Chickasaw Nation, having been adopted by said Nation. The plaintiff in error sought to avail himself of this variance between the proof in the case and the indictment in motions for a new trial and in arrest of judgment. This question was disposed of by the trial judge, in his charge to the jury, as follows:

"There is a question in this case in regard to the citizenship of the parties. It is shown by the testimony that Stevenson had married a lady that was a Chickasaw. I believe, residing in the Indian Territory. The evidence further shows that Joe Gaines was a white man, and not a citizen of the Indian Territory, although the bill of indictment alleges that they were both white persons, noncitizens of the Indian Territory; that being a jurisdictional matter, when the evidence establishes that either was a citizen of the United States, this court has jurisdiction, so far as that point is concerned."

We agree on this point with the trial judge. The averment in the indictment that Joe Gaines was a white person, and not a citizen of the Indian Territory, having been established by the evidence, the court had jurisdiction in the case, and the averment as to the color and citizenship of John Stevenson became and was surplusage, and no evidence was necessary to be given to prove it.

There are other rulings of the trial court discussed in the assignment of errors and the briefs of counsel, but, from the view we take of the case, they need not be considered. The admission of the evidence of Mrs. Joe Paul, the rejection of the evidence of Alexander Smith, and the refusal of the court to give the charge relating to the law of self-defense, as requested by the plaintiff in error, were errors which require us to reverse the verdict and judgment of the lower court, and remand the cause with instructions to set aside the verdict and judgment, and award a new trial, and it is so ordered.

SWAYNE, District Judge, dissents.