**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Louis Phillip PAQUET, Jr.**
**Defendant-Appellant.**

**No. 72-2855.**

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1973.

Dick DeGuerin, Houston, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., Ellis C. McCullough, James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

A jury, composed of eleven women and one man, convicted Louis Phillip Paquet, Jr. of unlawfully possessing counterfeit ten dollar bills, with the intent to defraud, 18 U.S.C., § 472.[1] There had been a hung jury on a prior trial of the case. It was alleged that the offense had been committed in Houston, Texas, on May 21, 1971.

The appellant complains of the "systematic exclusion of all persons twenty-five years of age or younger from the jury panel" and further contends that the trial court committed reversible error when it refused to allow him to testify as to the content of certain conversations between him and the government informer, Lewis Christian. We reverse and remand.

Accompanied by a Secret Service agent, Christian, the informer, flew from Nashville to Houston for the purpose of contacting Paquet. Upon arrival in Houston, other Secret Service agents first searched Christian and then taped a concealed transmitter to his stomach, with a microphone clipped to his T-shirt. This device would transmit Christian's conversations to the listening agents. From the airport, Christian telephoned Paquet at his downtown office. Paquet drove to the airport, picked up Christian, drove directly back to his office, and remained there for about an hour and a half. Agents outside the office building, listening via the transmitter, overheard conversations between Christian and Paquet. In his testimony for the Government, Agent Frank Waltermire did not detail the conversation as to specific statements made by either Christian or Paquet. The prosecution was content with allowing him to say simply that, "I overheard a conversation between Lewis Christian and the defendant, Mr. Paquet, concerning counterfeit one-hundred-dollar bills and how some new equipment was needed to be purchased before they could be manufactured. There was also some conversation about going to Las Vegas and passing counterfeit money while gambling, something about sticking the money in the clothes there in Las Vegas".

Agent Waltermire did not elaborate beyond the view that "nearly all of the conversation was by Mr. Paquet", and that Christian "said it would be difficult to do it in Las Vegas", or something like that, but the rest of the conversation was by Mr. Paquet about the one-hundred-dollar counterfeit bills and some new equipment to do it.

While suggestive, this testimony was quite inconclusive. For example, Agent

---

1. 18 U.S.C., § 472. Uttering counterfeit obligations or securities

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

Waltermire did not know who had originated the discussion of counterfeit money and he heard nothing specific about the criminal conduct for which Paquet was on trial. What he did say was that as between the two men, the pursuer and the pursued, there had been conversation about counterfeit hundred dollar bills. Paquet was being tried, as the indictment charged, for the unlawful possession of counterfeit *ten* dollar bills.

In any event, Christian and Paquet then left the office and drove across town to the apartment of one Weldon Clouarte [the name was so spelled by the Secret Service agent]. To avoid detection, the agents hung back too far to know who, if anybody, got out of the car and went into Clouarte's apartment. After about five or ten minutes Paquet and Christian left the area. By way of the transmitter, nothing more than the word "money" was overheard as the pair seemed to drive about aimlessly, during which they stopped at a service station for about ten minutes.

After leaving the service station, the agents, via the transmitter, heard Paquet say, "They followed you from the airport. Roll down the window and throw it out, or run". This precipitated an immediate arrest. A paper sack with approximately $60,000 in ten dollar counterfeit federal reserve notes was found on the floorboard of the automobile "next to Christian's left knee". Subsequent examination revealed Paquet's fingerprints on several yellow slips of paper which had been interspersed among the wrapped bundles of the counterfeit currency. There were no fingerprints on the bills. About twenty other sets of fingerprints were found on other yellow slips of paper, but they were not identified as belonging to either Paquet or Christian. No counterfeit one-hundred-dollar bills were found in the vehicle.

On cross examination Agent Waltermire testified that after the arrest a warrant was obtained for the Clouarte apartment. In a garbage can near the apartment $61,000 was found in the same ten dollar counterfeit bills as had been taken from the Paquet automobile. Within the apartment itself were small pieces of the same ten dollar counterfeit bills "that somebody tried to burn". Small portions of the same bills had been ground up in the garbage disposeall machine.

Agent Waltermire further testified that soon after the arrest, while being questioned, Paquet told him that his fingerprints would be on the bills because Christian had shown them to him and had tried to sell them to him but that he did not want to be involved.

A warrant was obtained and Paquet's office was searched but no counterfeit bills were found.

Following Agent Waltermire, the government then offered the fingerprint testimony already described, and rested its case.

The informer Christian, although in the courthouse in the custody of the Marshal, was not offered as a witness by the government in the presentation of its case in chief.

Paquet moved for a directed verdict of not guilty on the ground that the government had wholly failed to prove a prima facie case of wilful possession; that the government had chosen to rely altogether on circumstantial evidence, insufficient to eliminate all reasonable hypotheses of innocence. The government responded that the money was in the car "and in the joint possession of the two people *to the extent that they were both in the car* (emphasis added)", and that there was a strong inference that Paquet's fingerprints could have only gotten on the yellow slips while packaging the counterfeit money. The motion was denied. This ruling is not challenged on appeal.

Paquet, age twenty-six, took the witness stand in his own behalf. He denied

that on May 20, 1971, he was in possession of the counterfeit money but admitted that he knew it was in the automobile. He testified that the money was picked up at the Clouarte apartment by Lewis Christian, that he had declined to have anything to do with the counterfeit money because he had too much at stake in his company, had put too much hard work in it, and that he considered the counterfeiting scheme to be "kind of crazy". He further testified that after Christian brought the money into the automobile, he tried to interest him [Paquet] in passing the money. At that point the United States Attorney objected to any further testimony about what Christian told Paquet "as hearsay". The Court sustained the objection. Counsel for Paquet said that it was a part of the *res gestae,* that it was at the moment of the alleged offense, but the Court adhered to its prior ruling. The United States Attorney stated that *"res gestae* is no exception to the hearsay rule".

There was considerable further discussion and the United States Attorney reiterated that Paquet could not testify to what Lewis Christian told him about the money, that it was hearsay, and the Court again sustained the objection.

Defense counsel made another effort and propounded the following question, "What did Lewis Christian tell you concerning this counterfeit money [at the time it was in the car]"? The prosecutor objected, the Court overruled the objection, and Paquet responded that Christian asked him if he wanted to become involved in a scheme to pass the money. The government objected, and again the objection was sustained.

At one point in this prolonged discussion between Bench and Counsel, the Court declared that it was inadmissible for Paquet to say what Christian told him about the money.

■ The doctrine of *res gestae* is an exception to the rule against hearsay.

If closely accompanying material acts or situations this exception permits statements which otherwise would be inadmissible, United States v. Rouse, 5 Cir., 1971, 452 F.2d 311, 313.

■ That, however, is not the crucial point of this case. Apparently eluding the notice of the trial court, the critical point was that in an effort to prove Paquet's guilt the government had introduced its version of *part* of the conversation. It necessarily followed that the defendant was entitled to present his version of the entire conversation. The prosecution cannot give its version of a matter and thereafter muzzle the defendant.

The situation here is like that found in Carver v. United States, 1897, 164 U.S. 694, 17 S.Ct. 228, 41 L.Ed. 602. Carver's appeal was from the famous court of Judge Isaac Parker in the Western District of Arkansas, which had jurisdiction over the Indian Territory. At Muscogee, in the Creek Nation, while terribly drunk, Carver had either intentionally or accidentally shot his female companion in the back, resulting in his conviction of murder. The Supreme Court of the United States unanimously reversed on the following reasoning:

"The sixth assignment of error was taken to the refusal of the court to permit the defendant to prove by Mary Belstead and Mary Murray the declarations of defendant, and what he said to deceased, and what she said to him, at the place of the fatal shot, immediately after the shot was fired, for the reason that the same was part of the res gestae, and was also a part of the conversation given in evidence by the government witnesses. We fail to understand the theory upon which this testimony was excluded. Hays and Brann, two witnesses for the government, had testified that they had heard the shots fired and the scream of a woman; that Brann started for the place, and met defendant running

away; that defendant went back towards the woman, and then returned again, when Brann caught him and took him back to the woman, about 30 yards. About this time Hays came up, and both testified as to the conversation or exclamations that were made, between deceased and the defendant. Defendant's two witnesses, Belstead and Murray, appear to have come up about the same time, and, whether the conversation that took place between defendant and deceased at that time was part of the res gestae or not, it is evident that it was practically the same conversation to which the government's witnesses had testified. If it were competent for one party to prove this conversation, it was equally competent for the other party to prove their version of it. It may not have differed essentially from the government's version, and it may be that defendant was not prejudiced by the conversation as actually proved; but where the whole or a part of a conversation has been put in evidence by one party, the other party is entitled to explain, vary, or contradict it."

This is exactly what the Fifth Circuit held the next year in the case of Stevenson v. United States, 1898, 86 F. 106. This was another murder case which arose at Paul's Valley in the Chickasaw Nation, tried in the United States District Court for the Eastern District of Texas. In an opinion by Circuit Judge Pardee, it was there stated:

"The conversations and declarations of the accused after his arrest formed no part of the res gestae, and in his behalf were inadmissible, but they were admissible against him if the prosecution saw fit to avail itself of them, and when the United States

proved the conversations and declarations the accused was entitled to have the full conversation or conversations given in evidence. *This we understand to be elementary.*" [Emphasis added].

To like effect, see United States v. Littwin, 6 Cir., 1964, 338 F.2d 141, cert. denied 380 U.S. 911, 85 S.Ct. 896, 13 L. Ed.2d 797; United States v. Corrigan, 2 Cir., 1948, 168 F.2d 641; and D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338.

We reiterate the language of the Supreme Court in *Carver, supra:*

"If it were competent for one party to prove this conversation, it was equally competent for the other party to prove their version of it. It may not have differed essentially from the government's version, and it may be that defendant was not prejudiced by the conversation as actually proved; but where the whole or a part of a conversation has been put in evidence by one party, the other party is entitled to explain, vary, or contradict it."

Since the District Court declined to permit Paquet to offer proof of his version of the conversation between him and Christian after the parties had left the Clouarte apartment, the conviction must be reversed and the appellant awarded a new trial.

This disposition of the appeal renders it unnecessary to discuss the other issues which it seeks to raise.

Reversed and remanded.

GEWIN, Circuit Judge (concurring specially):

Although I agree with the result reached by Judge Coleman's application of the evidentiary principle denominated "opening the door",[1] I do so for slightly

---

1. The principle has been invoked by both the Supreme Court and this court in the remote past. *See* Carver v. United States, 164 U.S. 694, 697, 17 S.Ct. 228, 41 L.Ed. 602 (1897); Stevenson v. United States, 86 F. 106, 110–111 (5th Cir. 1898). Other circuits have recently given it expression in a variety of contexts. *See, e. g.*, United States v. Miriani, 422 F.2d 150, 153 (6th Cir.), cert. denied, 399 U.S. 910, 90 S.Ct. 2199, 26 L.Ed. 2d 561 (1970) (oral statements made by defendant to IRS agent); United States v.

different reasons. As expounded upon by Judge Coleman, this principle may be susceptible to treatment as an intractable rule, the violation of which is grounds for reversal per se. Since the Supreme Court has chosen to delimit the categories of trial court evidentiary errors which must invariably result in reversal,[2] I would have misgivings about any decision which could be construed to expand that list.

Rather, I choose to bottom my opinion on the ground that what transpired in the proceedings below jeopardized Paquet's right to a fair trial. In reaching this conclusion I am mindful of the words of Justice Harlan that:

> [T]he Federal Constitution does not guarantee trial procedures that are the best of all worlds, or accord with the most enlightened ideas of students of the infant science of criminology, or even those that measure up to the individual predilections of members of this Court.[3]

Nevertheless, the presence of a confluence of factors impels me to the aforementioned conclusion.

The substance of the exchange about which Paquet sought to testify served as the exclusive basis for his entrapment defense. As Judge Coleman eloquently indicates, once the government introduced a portion of the conversation between Christian and Paquet through one of its agents, Paquet should have been permitted to fully explain the conversation from his point of view. The unfairness occasioned by the curtailment of his testimony was aggravated by the fact that after both the government and Paquet had completed their cases, the government was permitted to present Mr. Christian as a rebuttal witness. It appears to me that his testimony constituted much more than rebuttal. Although a self-confessed perjurer, Christian, if believed, served to bolster and substantially strengthen the government's case. Indeed, he was permitted to place his "gloss" on the conversation after the court had refused to entertain Paquet's. In these circumstances, a denial of the right of Paquet to explain the conversation and the subsequent appearance of Christian as a so-called rebuttal witness very likely gave the jury the impression that the government's version of the conversation was the correct one.

It may be argued that in view of evidence seriously implicating Paquet in the commission of the crime with which he is charged and the opportunity he had in examining Christian to fully expose those aspects of their exchange which supported his entrapment defense, whatever error committed by the trial judge was harmless. In my view, whatever force this argument has derives

Littwin, 338 F.2d 141, 145 (6th Cir. 1964), cert. denied, 380 U.S. 911, 85 S.Ct. 896, 13 L.Ed.2d 797 (1965) (tape recording); United States v. Bohle, 445 F.2d 54, 66 (7th Cir. 1971) (medical record); Harris v. Smith, 372 F.2d 806, 816–817 (8th Cir. 1967) (medical record). *See also* Durham v. Cox, 328 F.Supp. 1157, 1165 (W.D.Va. 1971) (confession).

2. In Chapman v. California, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court noted only 3 situations in which error of even constitutional dimension is harmful per se: first, admission into evidence of a coerced confession; second, denial of the right to counsel, and third, trial by an impartial judge. I do not understand the Supreme Court's opinion in United States v. Carver, *supra*, to elevate the open-door principle to a constitutional right.

Even if my understanding is incorrect, since the Court had *Carver* before it when it enunciated the error per se categories in *Chapman*, it is hazardous to maintain that the "open-door" principle is an additional category.

In United States v. Bohle, *supra*, 445 F.2d at 66, the Eighth Circuit Court of Appeals refused to hold that a trial court's violation of the open-door principle was an absolute ground for reversal.

3. McGautha v. California, 402 U.S. 183, 221, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). *Cf.* Lutwak v. United States, 344 U.S. 604, 619–620, 73 S.Ct. 481, 97 L.Ed. 593, rehearing denied, 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352 (1953); Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Smith v. Smith, 454 F.2d 572, 578–579 (5th Cir. 1971).

largely from its generality, and is attenuated when applied to the instant case. Certainly, the fact that Paquet may have committed a crime cannot vitiate any impropriety attendant to the curtailment of his attempt to establish a defense. Courts are particularly reluctant to deem error harmless where, as here, the error precludes or impairs the presentation of an accused's sole means of defense.[4] Nor can the errors be considered harmless under the putative theory that by availing himself of the opportunity to elicit testimony from Christian concerning those aspects of the conversation most favorable to his defense, Paquet could have fully exposed his position to the jury. In my view, a surrogate explanation by Christian, a government witness, would be an inadequate substitute for Paquet's own testimony, where Paquet's own testimony was curtailed without explanation to the jury as to the reasons therefor while the government's evidence on the same matter was permitted.[5]

It is not my purpose to suggest a per se rule for the orderly presentation of evidence or the sequence which should be followed in the prosecution of a criminal case. Indeed, this court has assiduously adhered to the rule that a trial judge must remain free to exercise his discretionary powers to promote the ends of justice.[6] However, we have just as scrupulously applied the principle that it is the trial judge's duty "to conduct an orderly trial and to make certain as far as possible, that there is no misunderstanding of the testimony."[7] In view of the fact that the rulings of the district court were not clear and explicit, and that no explanation of the reasons for such rulings was proffered to the jury, the district court was remiss in complying with its duty. This noncompliance, when coupled with the rejection of Paquet's explanation of the conversation between Christian and himself, substantially prejudiced Paquet's trial. For the above mentioned reasons I concur in the decision to reverse the judgment of conviction.

4. *See, e. g.*, Braswell v. Wainwright, 463 F. 2d 1148 (5th Cir. 1972) (exclusion of defendant's sole witness who, without knowledge of defendant, had violated sequestration order held denial of due process); United States v. Minor, 459 F.2d 103 (5th Cir. 1972) (exclusion of record of state court adjudication of incompetency not harmless in criminal prosecution wherein defendant raised insanity defense, despite fact that defense witnesses had testified as to defendant's adjudication of incompetency). *See also* Eli Lilly & Co., Inc. v. Generix Drug Sales, Inc., 460 F.2d 1096, 1105 (5th Cir. 1972) (reversible error to curtail discovery of sole grounds of defense in civil case).

Where the excluded evidence is merely corroborative, this court is more likely to find its exclusion harmless. *See, e. g.*, United States v. Miles, 445 F.2d 974, 976–977 (5th Cir.), cert. denied, 404 U.S. 912, 92 S.Ct. 231, 30 L.Ed.2d 185 (1971).

5. A broader rationale, but one not tantamount to a per se rule, is that secondary evidence is an inadequate substitute for primary evidence concerning the critical grounds for defense. *Cf.* United States v. Minor, *supra*.

6. United States v. Jacquillon, 469 F.2d 380, 387 (5th Cir. 1972). *Cf.* Bursten v. United States, 395 F.2d 976, 982 (5th Cir. 1968).

7. Posey v. United States, 416 F.2d 545, 555 (5th Cir. 1969), cert. denied, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127, petition for rehearing denied, 397 U.S. 1031, 90 S.Ct. 1267, 25 L.Ed.2d 544 (1970). *See* United States v. Owens, 453 F.2d 355, 356 (5th Cir. 1971); O'Brien v. United States, 411 F.2d 522, 523 (5th Cir. 1969); Kyle v. United States, 402 F.2d 443, 444 (5th Cir. 1968).