IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 5, 2008

Charles R. Fulbruge III
Clerk

No. 07-50455

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

RICHARD BAILEY GARCIA,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, BENAVIDES, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Richard Bailey Garcia was indicted on four counts of importing and possessing with intent to distribute more than 500 grams of cocaine and marijuana in violation in violation of 21 U.S.C. §§ 841(a)(1), 952(a), and 960(a)(1). A jury convicted him on all four counts. The district court denied his motion for a new trial and sentenced him to four concurrent terms of 70 months' imprisonment. He now appeals his conviction and we affirm.

I

Early one morning in April 2006, Garcia attempted to re-enter the United States from Mexico at the Del Rio, Texas Port of Entry. Accompanied by Brenda Menchaca, Garcia was driving a pick-up truck with a secret compartment

containing marijuana and cocaine. Garcia claimed he was returning to his home in Del Rio after an evening at a nightclub in Ciudad Acuna, Mexico. Ramon Vasquez, a Customs and Border Protection (CBP) officer, inspected the undercarriage of Garcia's truck and saw shiny bolts indicating someone recently had worked on the truck.

Vasquez asked Garcia whether he owned the truck and had worked on it recently; Garcia said he had owned the truck for "a long time," but had not worked on it. Suspicious, Vasquez called for a canine, which alerted to the presence of narcotics in the truck's bed. Vasquez then ordered Garcia to a secondary inspection station where CBP officers Leonard Rodriguez and Julian Fonseca met Garcia and Menchaca. Rodriguez asked Garcia whether the truck was his; Garcia now responded that his uncle, "Jarrod Lang," owned the truck.[1]

Fonseca inspected the truck's bed and testified that it appeared less sturdy than a typical truck bed. He began jumping up and down on the truck's bed both to test it and gauge Menchaca's and Garcia's reaction, both of whom sat a few feet away. Fonseca testified he was suspicious that neither Menchaca nor Garcia turned to observe Fonseca, and that he believed most people would be naturally curious as to his actions. Fonseca then asked Garcia whether anyone recently had worked on the truck. Garcia now claimed his uncle had worked on the truck a month before.

Rodriguez escorted Menchaca and Garcia inside a building at the checkpoint and noted that Garcia's behavior "just didn't seem normal" and that Garcia avoided eye contact and looked away when questioned. Rodriguez then returned to assist Fonseca with the vehicle investigation. Using a density meter, Rodriguez determined an object was concealed within the truck's bed. Fonseca drilled a hole into the bed and uncovered a green leafy substance later identified

---

[1] The truck's vehicle identification number and license plates were registered to Mr. Lang, but agents were unable to locate him.

as marijuana. Fonseca then discovered a trap door to a secret compartment located in a freshly painted portion of the rear tire well. Inside, Fonseca found fifty-five bundles of marijuana and one bundle of cocaine.

After the bundles were discovered, Bureau of Immigration and Customs Enforcement (ICE) Special Agents Frank Ayoub, Jr., and Gabriel Villanueva interviewed Menchaca and Garcia. Ayoub testified that Garcia claimed his childhood friend Roy Mendez asked Garcia to drive his truck from the nightclub into the United States. Garcia admitted that Mendez told Garcia to state that the truck belonged to Garcia or to his "uncle," Jarrod Lang if questioned about its ownership. After the interview, the agents arrested Garcia.

At trial, Agent Ayoub testified from his "independent recollection" about statements Garcia made during the interview. The government never attempted to introduce an audiotape or transcript of the interview. On cross-examination, defense counsel asked Ayoub whether the interview was recorded. After Ayoub answered that the interview was audiotaped, defense counsel requested that Ayoub read aloud a portion of the transcript, which she provided. The government objected, arguing that the transcript was not in evidence. During a series of bench conferences, defense counsel argued the transcript was admissible under Fed. R. Evid. 106 and the common law rule of completeness. The district court ruled that both were inapplicable since the government did not place any portion of the transcript into evidence. After the jury found Garcia guilty, he moved for a new trial based, in part, on the district court's exclusion of the transcript.

Garcia now appeals his conviction and argues that the district court's exclusion of the transcript was error and requires a new trial. He cites five of his statements Ayoub relayed that Garcia argues were taken out of context and which he was unable to explain since the transcript was excluded. First, Ayoub testified that "Mr. Garcia also told us he was very suspicious that the vehicle

was loaded." Garcia argues that he only answered affirmatively to an agent's question that "you had to have been pretty suspicious." Additionally, Garcia says he did not use the term "loaded," which implied he was familiar with drug smuggling terminology. Second, Ayoub testified that Garcia was unemployed and "further in his discussion with us after that question said 'As a matter of fact, I have a child at home . . . and I'm trying to do anything I can do right now to help support this child.'" Garcia argues that this implied a level of desperation that the transcript does not indicate because he also told the agents he was waiting to hear about a prospective job. Third, Ayoub testified that "Mr. Garcia claimed that Brenda Menchaca had no involvement in this," which Garcia argues implied he was guilty and was protecting her. Nonetheless, the interrogation transcript includes an agent's statement "if she has something to do with it, I need to know," and Garcia's reply "No sir." Fourth, Ayoub testified that Garcia said "How am I going to help myself when I'm going to jail already?" Garcia also argues this was prejudicial, because it implied he knew he had broken the law. Garcia argues he only said this in response to the agent's statement that Garcia was likely facing prison time and needed to answer honestly. Finally, Ayoub testified that Garcia changed his story three times regarding where he was to meet Roy Mendez and return the pick-up truck. Garcia argues that during the interrogation he mentioned the same location twice and once stated it was possible he would meet at Mendez's home.

## II

We review a district court's evidentiary ruling for abuse of discretion.[2] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[3] This court

---

[2] United States v. Burns, 162 F.3d 840, 852 (5th Cir. 1998).

[3] United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (internal quotation marks omitted).

heightens our review of evidentiary rulings in criminal trials.[4] An abuse of discretion in excluding evidence, however, is subject to harmless error review.[5]

## A

We must first determine whether the district judge erred in concluding that Rule 106 was inapplicable and excluding the transcript. Rule 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."[6] The rule's purpose is "to permit the contemporaneous introduction of recorded statements that place in context other writings admitted into evidence which, viewed alone, may be misleading."[7] Of course, "the Advisory Committee stressed that it 'does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case.'"[8]

The government contends that the district court correctly ruled that Rule 106 is inapplicable because the rule "is expressly limited to situations in which part of a writing or recorded statement is introduced into evidence." Since the government did not introduce or attempt to introduce the tape recording or transcript—relying solely on Agent Ayoub's memory—it argues the rule is facially inapplicable. The government further argues that the Advisory Committee's Note bolsters this argument because the note provides that "[f]or

---

[4] Id.

[5] Id. at 201.

[6] FED. R. EVID. 106.

[7] United States v. Branch, 91 F.3d 699, 727 (5th Cir. 1996) (internal quotation marks omitted).

[8] Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988) (quoting FED. R. EVID. 106 advisory committee's note).

practical reasons, the rule is limited to writings and recorded statements and does not apply to conversations."[9]

We have encountered, but not decided, this issue in United States v. Branch.[10] In that case, the government argued that Rule 106 did not permit the defendant to introduce a Texas ranger's written postarrest report after the ranger testified from memory about the defendant's postarrest statements and the government had not introduced the written report. As here, the government argued Rule 106 applied only to writings or recorded statements. We observed that other circuits had declined to apply the rule to testimony regarding conversations.[11] Without deciding the issue, we noted that Rule 106 only allows the admission of portions that are "relevant and 'necessary to qualify, explain, or place into context the portion already introduced.'"[12] Since the Branch appellant failed to demonstrate the excluded portions' relevance or necessity, we held that even if the testimony was subject to Rule 106, the rule did not require the admission of the excluded portions.[13]

Citing an Eleventh Circuit opinion, United States v. Pendas-Martinez, Garcia argues Rule 106 applies both when a party introduces "a writing or recorded statement" or elicits testimony that is "tantamount to the introduction of" the writing or recorded statement.[14] Garcia contends Agent Ayoub's

---

[9] FED. R. EVID. 106 advisory committee's note.

[10] 91 F.3d at 727.

[11] Id. at 727-28.

[12] Id. at 728 (quoting United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988)).

[13] Id.

[14] 845 F.2d at 943.

testimony regarding Garcia's statements was tantamount to introducing portions of the transcript.

In Pendas-Martinez, the government sought to introduce a Coast Guard officer's report of a boat chase and subsequent arrest of alleged drug smugglers.[15] The government asserted that defense counsel had read from and extensively used the report on cross-examination which was tantamount to introducing the report as evidence. The Pendas-Martinez court disagreed with the government's argument. While defense counsel had used the report, he did not "read from the report to suggest that [the Coast Guard officer's] testimony was inconsistent with the report"—notwithstanding one inadvertently read remark, which counsel struck—"or otherwise attack [his] credibility with the report."[16]

The Pendas-Martinez court compared these facts with Rainey v. Beech Aircraft,[17] the foundation of the Eleventh Circuit's "tantamount" standard. In Rainey, the plaintiff sued an aircraft manufacturer after his wife, a navy flight instructor, died in an airplane crash. Previously, a navy investigation concluded pilot error, not manufacturer's defect, caused the crash. In a letter to the navy investigator, the plaintiff, also a navy flight instructor, disputed that conclusion and argued that mechanical malfunction caused the crash.[18] Nonetheless, in two paragraphs, the plaintiff wrote that his wife was under "unnecessary" pressure, tried to cancel the practice flights on three occasions, and had violated "pattern integrity" when her plane "turned crosswind without proper interval."[19] Since

---

[15] Id. at 940.

[16] Id. at 944.

[17] 784 F.2d 1523 (11th. Cir. 1986), aff'd in part, rev'd in part, 488 U.S. 153 (1988).

[18] Id. at 1526 (noting plaintiff argued in a letter that the accident was "caused by some form of pneumatic sensing/fuel flow malfunction, probably in the fuel control unit").

[19] Id. at 1528-29.

these statements supported the defendant–manufacturer's theory of pilot error, the defendant called the plaintiff as an adverse witness and asked him whether he had written these statements in his letter. On cross-examination, the trial court sustained the defendant's objection to the question: "in the same letter to which [defense counsel] made reference . . . did you also say that the . . . primary cause of this mishap was [mechanical error]?"[20]

The Eleventh Circuit disagreed with the trial court's ruling and reasoned that "the jury was given an incomplete and misleading impression of [plaintiff]'s position."[21] In affirming the holding of this portion of the Rainey opinion, but without explicitly adopting the "tantamount" standard,[22] the Supreme Court noted that plaintiff's letter explained at length his malfunction theory, including how the evidence supported that theory and not a pilot error theory.[23] Nonetheless, the jury was told that the plaintiff had written six months before and essentially admitted pilot error as the cause.[24] The jury could infer that the plaintiff "did not believe his theory of power failure and had developed it only later for purposes of litigation."[25] Thus, while defense counsel in Rainey did not enter the letter into evidence, the Eleventh Circuit noted in Pendas-Martinez that "isolated sentences were read out of context," creating a misleading

---

[20] Id. at 1529.

[21] Id. at 1530.

[22] Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988) ("While much of the controversy in this suit has centered on whether Rule 106 applies, we find it unnecessary to address that issue. Clearly the concerns underlying Rule 106 are relevant here, but, as the general rules of relevancy permit a ready resolution to this litigation, we need go no further in exploring the scope and meaning of Rule 106.").

[23] Id. at 171.

[24] Id.

[25] Id.

impression of the entire document and making it "tantamount to the introduction of the letter into evidence" and within the ambit of Rule 106.[26]

Here, it is undisputed that the government did not introduce as evidence the transcript or tape recording of the interrogation. Rule 106 does not apply to a witness's testimony at trial. Nor did the government quote or read from the transcript during direct examination. Therefore, even were we to adopt the Eleventh Circuit's "tantamount" standard, it would not apply here. In Rainey, the defendants questioned the plaintiff about isolated statements read from the letter. In other words, the jury was relayed quotations from the disputed letter. The fact that the defense counsel spoke those statements, rather than having the jury read them, was inconsequential. In this case, Agent Ayoub testified from memory as to a conversation. The jury did not hear or read quotations allegedly out of context that were tape recorded or transcribed. They heard Agent Ayoub testify as to his memory of the conversation.

While this distinction at first seems minor, the government persuasively argues that it is quite meaningful. A recording played or a document read in isolation is not subject to cross-examination. But an adversary can attack a live witness's credibility, confront the witness with previous inconsistent statements, or demonstrate bias or poor memory. As we have noted in a similar context:

> Only through live cross-examination can the fact-finder observe the demeanor of a witness, and assess his credibility. A cold transcript of a deposition is generally no substitute because it cannot unmask the veracity of a testifying witness clad in a costume of deception; it cannot unveil that a seemingly well-groomed witness is coming apart at the seams: "that he fidgets when answering critical questions, his eyes shift from the floor to the ceiling, and he manifests all other indicia traditionally attributed to perjurers."[27]

---

[26] United States v. Pendas-Martinez, 845 F.2d 938, 943-44 (11th Cir. 1988).

[27] Int'l Shortstop Inc. v. Rally's Inc., 939 F.2d 1257, 1265-66 (5th Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 270 (1986) (REHNQUIST, J., dissenting)).

FED. R. EVID. 106 seeks to relieve this tactical disadvantage by permitting an opposing party to combat an unquestioned "cold transcript" at the moment of its introduction by entering into evidence the remainder.[28]  If courts were to ignore this distinction, then any time a party elicited testimony from a witness regarding events also described in writing, the opposing party could attempt, not merely to impeach the witness on cross-examination, but to introduce contemporaneously through Rule 106 that document if the witness's statements did not perfectly match the written out-of-court description.  Such a result is particularly troubling since it remains unsettled whether Rule 106 trumps other evidentiary rules and makes the inadmissible admissible.[29]  In a similar case, United States v. Ramirez-Perez,[30] the Eleventh Circuit drew this distinction and declined to extend its "tantamount" standard.  In that case, the defendant gave a statement during interrogation that was later reduced to writing.  At trial, a Georgia Bureau of Investigation agent testified as to the oral statement.  The defendant sought to introduce the written statement under Rule 106, arguing in part that the agent's testimony was "tantamount" to introducing the written statement and that the written statement contextualized the agent's testimony.  The Eleventh Circuit distinguished Rainey as we have here and held that the

---

[28] FED. R. EVID. 106 ("When a writing or recorded statement . . . is introduced by a party, an adverse party may require the introduction at that time of any other . . . writing or recorded statement which ought in fairness to be considered contemporaneously with it.") (emphasis added).

[29] Barrett v. United States, 965 F.2d 1184, 1194 (1st Cir. 1992) ("[T]here is considerable disagreement whether FED. R. EVID. 106 can ever serve as a basis for admitting evidence which is inadmissible on other grounds.").  Compare United States v. Costner, 684 F.2d 370, 373 (6th Cir. 1982) ("[Rule 106] covers an order of proof problem; it is not designed to make something admissible that should be excluded."); United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir. 1981) (same) with United States v. Sutton, 801 F.2d 1346, 1368 (D.C. Cir. 1986) ("Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proferred evidence should be considered contemporaneously.").

[30] 166 F.3d 1106, 1113 (11th Cir. 1999).

10

district court did not err when it excluded the written statement.[31]  We agree with the Eleventh Circuit's holding.

In sum, we conclude the district court did not abuse its discretion in denying the introduction of the full transcript under Rule 106.  Since Garcia's argument does not meet the Eleventh Circuit's "tantamount" standard, we leave to another day the decision to adopt or reject that standard.

## B

Garcia next argues that even if Rule 106 did not allow the admission of the transcript, the common law rule of completeness does.  The Supreme Court has acknowledged that Rule 106 only partially codifies this common law rule.[32]  Garcia cites United States v. Paquet,[33] in which we held that it was error for the district court to disallow a defendant from offering any proof of his version of a conversation with a government informant after a government agent testified to the conversation's contents.[34]

Reading the record, we do not see an abuse of discretion similar to that committed in Pacquet.  Without introducing the document or laying a foundation, defense counsel handed Ayoub a copy of the transcript and asked him to read aloud from it.  The district court sustained the government's objection and told defense counsel that Agent Ayoub could not testify from a document that was not yet entered into evidence.  Afterwards, defense counsel

---

[31] Id. at 1113-14.

[32] Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171 (1988).

[33] 484 F.2d 208, 212 (5th Cir. 1973).

[34] Id. ("'If it were competent for one party to prove this conversation, it was equally competent for the other party to prove their version of it.  It may not have differed essentially from the government's version, and it may be that defendant was not prejudiced by the conversation as actually proved; but where the whole or a part of a conversation has been put in evidence by one party, the other party is entitled to explain, vary, or contradict it.'") (quoting Carver v. United States, 164 U.S. 694 (1987)).

did not attempt to lay a foundation or introduce the transcript. The court then permitted Ayoub to read silently the document to refresh Ayoub's memory.[35] The court stated that on cross-examination Ayoub could then testify, provided he remembered, about his specific questions and Garcia's answers during the interrogation. Thereafter, the record reflects several bench conferences, during which the court explained to defense counsel how she might refresh Ayoub's memory with the transcript.[36] Defense counsel then gave Agent Ayoub a portion of the transcript and requested that he read silently a single line. Ayoub stated that it refreshed his memory, but he nonetheless believed his testimony regarding Garcia's statements pertained to another portion of the interrogation and remained correct and truthful. Defense counsel again conferred with the court, now requesting the court to play an audiotape of the interview under the rule of completeness. For the same reasons it gave regarding the transcript, the court declined. The court then instructed defense counsel on a proper method of cross-examination and suggested questions defense counsel might ask to elicit the testimony she sought.[37] Defense counsel told the court she believed the line of questioning was ineffective. She then requested that the court require Agent

---

[35] FED. R. EVID. 612.

[36] The Court: The transcript is not in evidence. It was not put in evidence by the Government, so the rule of optional completeness does not allow you to put the rest of the transcript in evidence. You can ask [Agent Ayoub] if reading [it] refreshes his recollection.

Defense Counsel: I can do as far as what my client said.

The Court: I'm going to allow you to do that if his memory is refreshed; and if he has an independent recollection, he can testify; but if the transcript is not in evidence, the rule of optional completeness does not apply. . . . You can still elicit the testimony. You're just going to do it in a different manner. R. vol. 2, p.179-80.

[37] The Court: The audiotape didn't get introduced either. The rule of optional completeness is if the testimony is being introduced or is purported to be introduced, then you get to put it in. . . . What you need to do, [counsel], is you need to say, "Is it true that my client never said that?" You need to put the answer in your question. R. vol. 2, 181-82.

Ayoub to re-read silently the entire transcript; the court took a recess and directed Ayoub to read the entire transcript. The Court again suggested to defense counsel four more times how she might cross-examine Agent Ayoub after he was finished reading.[38] Defense counsel then asked a short series of questions based on the district court's suggestions and passed the witness.

The trial transcript reflects that the district judge was willing to entertain and suggest a variety of methods defense counsel could use to elicit testimony "explain[ing], vary[ing], or contradict[ing]"[39] Ayoub's portrayal of the conversation. The Federal Rules of Evidence provide a district court control over the mode and order of interrogation[40] and grounds to exclude relevant evidence.[41]

---

[38] The Court: "Did you review this? Now after reviewing it has your memory been refreshed?" "Yes." "Isn't it true my client never said X, Y, and Z." It's lengthy. If I have to take a short break if he needs to review it, that's fine. R. vol. 2, p. 183.

\* \* \*

The Court: What you are wanting to ask him is when the jury is back now that his memory is refreshed "Isn't it true that nowhere in that statement does my client say X, Y, and Z?" Isn't that what you really want to say? R. vol. 2, p. 184.

\* \* \*

The Court: So what is it that we're doing now?

Defense Counsel: Well, I mean, he's taking it out of context. He said he was unemployed.

The Court: So if you will ask it all sort of in a leading question and point out the context, you're able to get from point A to point B. The difference is you want him to say "I took it out of context" as opposed to leading the witness. So you can still do it, [counsel]. It's just the form of the question. R. vol. 2, p. 188.

\* \* \*

The Court: You can do what you want to do,[counsel]; but you're going to have to do it in this regard: "He testified that my client said X. Is this a transcript of what happened in that interview? You read it right? Isn't it true my client never said X?" So you can get what you're looking for; but in the form of the question. Okay? R. vol. 2, p. 190.

[39] United States v. Paquet, 484 F.2d 208, 212 (5th Cir. 1973).

[40] FED. R. EVID. 611.

[41] FED. R. EVID. 403.

While Garcia argues that some portions of the transcript were not hearsay because they were not offered for the truth of the matter asserted, we see no error in a district court refusing to accept a "lengthy" transcript[42] when the court was prepared to accommodate the defendant by numerous other means. While cases like Paquet allow parties to present evidence explaining, varying, or contradicting a witness's portrayal of the conversation, we do not read those cases as providing carte blanche to do so by any means desired. Garcia was given ample opportunity to explain his side of the conversation; that defense counsel did not exercise the variety of means available is not an error we attribute to the district court.

*    *    *

For the foregoing reasons, we AFFIRM the district court's ruling and find no error in its exclusion of the transcript.

---

[42] Cf. United States v. Abroms, 947 F.2d 1241, 1250 (5th Cir. 1991) ("In reviewing for an abuse of discretion by the district court concerning Rule 106, we are more than mindful that it also 'has discretion to conduct the trial in an efficient and orderly manner in the admission or exclusion of evidence.' Abroms wanted the jury to compare the length of the excerpted portions to the length of the entire conversations. However, this goal could have been attained through testimony of the witnesses who prepared the recordings. . . . The district court did not err in denying Abroms' request to play the tapes in their entirety to the jury.") (internal citations omitted).

14

REAVLEY, Circuit Judge, concurring:

While I cannot say the district court committed error, and I concur in the affirmance, I suggest that the matter of the transcript of Garcia's interview could have been handled better. I would have made it clear at the outset that the precise statements recorded in the transcript would be available for the jury and for defense counsel's argument. There was no question about the authenticity of the transcript. If the agent should agree that the transcript recited the words that he only characterized, the jury could be informed of his reformed testimony. If the agent objected to the words of the transcript, those words could be used to impeach. In any event, since the agent did use the transcript to refresh his memory, the portions of the transcript were admissible under Fed. R. Evid. 612.

The court did allow defense counsel to make full use of the transcript in cross-examination of the agent, and I will not fault the ruling or judgment.